In re TAX REDUCTION
INSTITUTE, Debtor.

William Douglas WHITE,
Trustee, Plaintiff,

v.

W. Murray BRADFORD,
et al., Defendants.

Bankruptcy No. 89–00377.
Adv. No. 91–0033.

United States Bankruptcy Court,
District of Columbia.

Feb. 28, 1992.

See also 138 B.R. 325.

66

Filippo Zucchi, Washington, DC, for plaintiff.

Steven H. Greenfeld, Washington, DC, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

S. MARTIN TEEL, Jr., Bankruptcy Judge.

A trial in this adversary proceeding was held on November 19, 1991. The court makes the following findings of fact and conclusions of law.

## General Background

An involuntary petition under Chapter 7 of the Bankruptcy Code was filed against the debtor, Tax Reduction Institute, on April 27, 1989. The plaintiff, William Douglas White, is the duly appointed trustee for the debtor's estate. In this adversary proceeding the trustee has pursued various alleged preferences under 11 U.S.C. § 547, fraudulent conveyances under 11 U.S.C. § 548, and unauthorized post-petition payments under 11 U.S.C. § 550.

At all times relevant to this proceeding, the defendant, W. Murray Bradford, was the debtor's president and one of its directors and the defendant, Elizabeth Ann Purcell, was the debtor's secretary and one of its directors. They were thus insiders for purposes of 11 U.S.C. § 547(b)(4)(B) by reason of 11 U.S.C. § 101(31)(A)(iv). The debtor's schedules list total debts in the amount of $711,908.67 and total assets in the amount of $35,046.50.

The adversary proceeding has been resolved as to all defendants other than Bradford and Purcell. In addition, Counts V and VI of the complaint have been resolved by the entry of partial summary judgment against Bradford. Left for resolution are Count I (alleged preferential transfers to Madison National Bank for the benefit of Bradford and Purcell), Count II (transfers to American Express Travel Related Services Co., Inc. for benefit of Bradford), Count III (post-petition transfers to Citibank for benefit of Bradford), Count IV (preferential transfer of equipment to Bradford) and Count VII (alleged fraudulent transfers of $3,700 to Bradford as advances).

## I

## Count I—Preferential Transfers to Madison National Bank for the Benefit of Bradford and Purcell

Prior to the date of filing of the petition the debtor executed four separate promissory notes for the benefit of Madison National Bank ("Madison"). The trustee has shown that the payments on these notes were preferences under 11 U.S.C. § 547(b) and the defendants have only partially shown that they fit within one of the exceptions under 11 U.S.C. § 547(c).

### A. The Payments at Issue

The notes (Exhs. 1 through 4) are respectively dated November 2, 1987, for $60,000; June 12, 1988, for $67,500; September 12, 1988, for $67,500; and February 12, 1989, for $45,000. . All notes were personally guaranteed by Bradford and Purcell under a Guaranty Agreement. Exh. 5. The November 2, 1987 note for $60,000 was due June 2, 1988, and it was apparently repaid in full. The June 12, 1988 note for $67,500 was a 90-day note due September 10, 1988. It was renewed, without any payments having been made,[1] by the September 12, 1988 note, a 9-month note due June 12, 1989. The February 12, 1989 note for $45,000 was a restructuring of the $45,000 unpaid balance of the September 12, 1988 note. The debtor made the following payments on the notes:

**On November 2, 1987 note:**

June 6, 1988—$7,690.32 ($7,500 principal and $126.87 interest). Under the terms of the note, this payment was due on June 2, 1988: 4 days late.

**On September 12, 1988 renewal note:**

October 26, 1988—$8,175 ($7,500 principal and $675.00 interest). Under the terms of the note, this payment was due on October 12, 1988: 14 days late.

November 21, 1988—$8,155 ($7,500 principal and $655.00 interest). Under the terms of the note, this payment was due on November 12, 1988: 9 days late.

December 20, 1988—$8,050 ($7,500 principal and $550.00 interest). Under the terms of the note, this payment was due December 12, 1988: 8 days late.

---

1. The June 12, 1988 note provided that principal amount was to bear interest at 2% above Madison's base lending rate. There is no evidence whether or when the 90 days of interest on that note was paid. It does not appear that the interest was rolled over into the September 12, 1988 renewal note of the same principal amount.

January 13, 1989—$517.29 interest. Under the terms of the note, a payment of principal ($7,500) and interest was due January 12, 1989: One day late.

**On February 12, 1989 renegotiated note:** February 24, 1989—$484.38 interest. Under the terms of the note, payment of interest only was due February 12, 1989: 12 days late.

March 12, 1989—$4,954.37 ($4,500 principal and $454.37 interest). Under the terms of the note, payment of *interest only* was due March 12, 1989: On time. All payments were on account of debts incurred by the debtor prior to when the payments were made.

### B.  *§ 547(b) Elements*

#### 1.  Facts

Defendant Bradford was to pledge his interest in a life insurance policy to Madison as security for the loans. However, assuming that Madison's security interest was properly perfected, and no evidence was submitted in this regard, Bradford failed to show the value of the security. The best he ever did in the proceeding was to submit an affidavit at the summary judgment stage stating that the value was not less than $5,000.00. Therefore, Madison was undersecured by an amount greater than the aggregate value of the preferential transfers sought to be avoided in this case. Moreover, there is no showing that the insurance policy was the debtor's property.

The debtor made the above payments within one year of the date of filing of the petition. The payments to Madison directly benefitted Bradford and Purcell by reducing their personal liability to Madison under the Guaranty Agreement. All the above payments, except for the March 12, 1989, payment, were made after the stated due date. The March 12, 1989, interest payment was timely. However, this payment was on account of a renegotiated note and included a gratuitous $4,500 principal payment not provided for by the February 12, 1989 note. At all times relevant to these transfers the debtor was insolvent. The estate remains insolvent and clearly

has insufficient assets to pay unsecured claims in full.

After the payments were made, Bradford received an indemnification agreement from third parties to indemnify him as to the Madison loan. In addition, Madison released him.

#### 2.  Elements of § 547(b) Proven

■ The trustee has carried his burden under § 547(b) of establishing that each payment was a preference (unless an exception under § 547(c) applies). As to § 547(b)(1), the payments were for the benefit of Bradford and Purcell who as guarantors were creditors. *In re Aldridge*, 94 B.R. 589, 591 (Bankr.W.D.Mo.1988). As to § 547(b)(2), each payment was on account of an antecedent debt owed by the debtor before the payment was made, the debt having arisen on the date of the loan not on the due date of each payment. *In re CHG Internat'l, Inc.*, 897 F.2d 1479, 1486 (9th Cir.1990). Even under *In re Iowa Premium Serv. Co., Inc.*, 695 F.2d 1109 (8th Cir.1982), the timely March 12, 1989 payment of interest was on account of interest that had accrued on each preceding day. *Id.* at 1111–12. As to § 547(b)(3), the parties have stipulated to the debtor's insolvency when each payment was made. As to § 547(b)(4), Bradford and Purcell were at all times insiders (see 11 U.S.C. § 101) and the payments were each made within one year of the date of the filing of the petition. Finally, as to § 547(b)(5), the payments enabled Bradford and Purcell to receive more in payment of their guaranteed debt than if the transfers had not been made and payment of the guaranteed debt were only made as provided by the provisions of Chapter 7 of the Bankruptcy Code. This is because the debtor's schedules show that there will not be 100% payment of all unsecured creditors. *Aldridge*, 94 B.R. at 592; *In re Continental Country Club, Inc.*, 108 B.R. 327, 332 (Bankr.M.D.Fla. 1989).

■ The defendants attempt to argue that the secured nature of the debt results in the trustee flunking § 547(b)(5). Their reliance on the pledge of life insurance

(their sole basis for this argument) proves to be a "red herring". First, if the policy was Bradford's property, and no showing was made to the contrary, the payment of the Madison debt out of the debtor corporation's funds benefitted Bradford. He obviously gains more within the meaning of § 547(b)(5) by having the payment stand instead of looking to the estate to pay him. Second, the life insurance (assuming there was a perfected pledge) was insufficient to make Madison fully secured. Madison was owed $67,500 on the June 12, 1988 note (which was renewed into the September 12, 1988 note and renegotiated into the February 12, 1989 note). The $5,000 value of the life insurance policy results in undersecured principal debt of $62,500 reduced by payments to $45,000 in unpaid principal. Payments on an undersecured debt are conclusively attributable first to the unsecured portion of the debt. *Drabkin v. A.I. Credit Corp.*, 800 F.2d 1153, 1157 (D.C.Cir. 1986). Because the payments on the June 12, 1988 note and subsequent notes always were less than the unsecured portion of the debt, the payments are deemed to have been made on account of unsecured debt.

■ Similarly, the court rejects the defendants' argument that the trustee flunks § 547(b)(5) because Bradford obtained an agreement from certain third parties after the payments were made to be indemnified if he were called upon to pay the Madison debt. Madison also then released Bradford. The indemnification agreement and release likely extended to only the Madison debt outstanding after the preferential payments were made. No showing was made to the contrary. Moreover, even if the indemnification agreement and release covered preferential payments that Bradford might otherwise be required to pay anew to Madison if the preferential payments were avoided by the trustee, the indemnification agreement and release are irrelevant. The question under § 547(b)(5) is whether the transfer enabled Bradford to receive more from the debtor on account of the debt than he would have otherwise. The indemnification of Bradford and his release by Madison would not be a payment from the debtor's estate and hence are irrelevant.

Moreover, the indemnification agreement and release did not make the earlier payments to Madison of no benefit to Bradford under § 547(b)(1). The payments were obviously of benefit to Bradford when made because no indemnification agreement or release then existed.

The trustee having proven the elements of a preference under § 547(b), the defendants bore the burden of establishing that the payments fit with an exception under § 547(c).

### C. § 547(c)(2) Exception

■ The defendants' invocation of 11 U.S.C. § 547(c)(2) presents the most difficult legal issue in this case. The Supreme Court has recently held that § 547(c)(2) may apply to long-term debt. *Union Bank v. Wolas*, — U.S. —, 112 S.Ct. 527, 116 L.Ed.2d 514 (December 11, 1991), *reversing In re ZZZZ Best Co., Inc.*, 921 F.2d 968 (9th Cir.1990), and overruling *In re CHG Int'l, Inc.*, 897 F.2d 1479 (9th Cir.1990), as to this issue. Nevertheless, the defendants bear the burden of establishing that the payments to Madison come within the three requirements of ordinariness under § 547(c)(2)(A), (B) and (C).

#### 1. Facts

In 1981 a friend of Bradford, who was an officer at Madison National Bank, persuaded Bradford to have the debtor commence a borrowing relationship with Madison. The summertime was the debtor's slow season for receipts. Madison and the debtor entered into a pattern of the debtor borrowing funds in the summer to tide it over and then paying back the lent sums in the balance of the year. Typically a 90–day loan calling for no payments prior to maturity would be taken out in the summer months and this would be paid at the end of the 90 days by the proceeds of a new 9–month loan in similar amount calling for monthly payments of interest and principal.

The debtor's operations changed substantially in 1988. The debtor sold its "Write-off" newsletter publication in the early part of the year for $1 million and used this to pay all trade debt. While the debtor

**70**

continued to receive an 80% commission on the newsletter without having to publish it, these proceeds were insufficient to cover the expenses for the operations it subsequently incurred. Upon the selling of the "Writeoff" newsletter the debtor's operations shifted to concentrating on selling its tax seminars and attempting to launch a new product entitled "The Bottom Line" and it was in the midst of trying to develop that new product that the debtor took out the 90–day loan of June 12, 1988. The operations did not fare well.

The debtor was having difficulty making payments to creditors anywhere near on time in the fall of 1988. This is evidenced by three creditors' billings.

The Twin Bridges Marriott billed the debtor on August 12, 1988 for "banquet charges from June 28, 1988" and this bill was not paid until January 17, 1989. Exh. 24. Voyager Services Company sent an invoice to the debtor dated July 31, 1988, and this was not paid until March 2, 1989. Exh. 23. Rochester Academy of Medicine billed the debtor $896.00 by an invoice dated October 28, 1988, and then mailed a copy as a second notice labelled "Past Due" which the debtor received December 8, 1988. Exh. 20. This was not paid until March 2, 1989. Exh. 21. Although Bradford testified that the debtor was generally paying its bills in the fall of 1988, he did not explain why these bills were paid so late and offered no evidence (beyond his self-serving testimony) to show that bills were generally being paid.

I thus cannot credit Bradford's testimony that the debtor's track record in paying trade creditors was no more lousy in the fall of 1988 then it had been in the fall of 1987 or prior years. Bradford testified that trade creditors historically (even in years preceding the year before the bankruptcy petition was filed) were always being paid late and the bank was always paid on an earlier basis: it was "more current." Bradford maintains that in the fall of 1988 he was not foregoing payments to trade creditors in comparison to prior years and that no cash problem existed until January 1989. In his words, the business had al-

ways been "a pathetic business; it always lost money." But the evidence suggests that by the fall of 1988 the debtor's operations and its degree of lateness in paying creditors had in fact worsened in comparison to 1987 and 1986.

There was one other change. The debtor had sold off a valuable asset and paid off trade creditors in the early part of 1988: the debtor was now an insolvent company with insufficient assets to pay trade creditors.

The debtor had a history of not paying its note obligations to Madison precisely on the due date under the terms of the notes. At various points in his testimony Bradford referred to the fact that Madison gave the debtor a grace period for making payments and that this period is what the debtor followed in the case of the payments at issue here. First he said that it was an 8–day grace period. Then, upon a leading question from counsel he said the way the debtor paid the bank from the inception was within *two weeks* of the due date. Then upon cross examination, in acknowledging that there was nothing about a grace period in the notes themselves, he volunteered that the loan officer (his friend) told him that the debtor could pay late within *10 days* and the debtor would not be penalized, *i.e.*, no additional interest would be charged. Despite the seeming inconsistencies concerning the length of any grace period, the court credits Bradford's testimony that payments were made from the inception within two weeks of the due date. No objection was made to the leading nature of the question eliciting this testimony, the trustee presented no documentary payment history to rebut this testimony, and there was no suggestion the bank complained in the fall of 1988 that the late payments were contrary to the debtor's past performance. While a grace period may have been discussed of 8 or 10 days, the debtor and bank certainly could have fallen into a pattern of accepting payments as much as two weeks late.

By January 1989, the debtor began to suffer more severe cash flow problems than it had in the past and by February

1989 adopted a "squeaky wheel" rule, using cash flow for only those bills necessary to keep operations continuing: even by Bradford's admission there was insufficient cash to pay all creditors and trade creditors were falling way behind. The payments to Madison in January, February and March, 1989, were in the midst of this slide into liquidation. On January 12, 1989, Bradford wrote to Madison advising that:

> Since our business has changed where the majority of our revenue now comes from seminars, rather than newsletter sales, we experienced the Christmas slow-down for the first time. Due to that slow-down in which our cash flow dropped drastically, we need to extend the note for one additional month.

> Beginning February 12, 1989, we see no problem meeting our remaining installment note obligations.

> Enclosed with this letter is our interest check in the amount of $517.29 which leaves our principal balance of $45,000.

> If it is not possible to extend the note one additional month, we should be able to make a $15,000 balloon payment at the end of the note term. [The note's term ended June 12, 1989.]

On February 12, 1989, the bank and the debtor restructured the promissory note by entering into a new note due in 90 days (by Monday, May 15, 1989) for $45,000, bearing an interest rate floating at 2% per annum over the bank's base lending rate. No date for payment of interest was inserted in the note in contrast to two of the prior notes. But the trustee is of the perhaps mistaken view and tried this proceeding on the basis that interest was payable on the 12th of each month and the court will hold the trustee to that view. The note, however, required no payments of principal (although the bank could demand payment of the note forthwith if its collateral was insufficient adequately to secure the bank). The note included one further change: the prior note was due on June 12, 1989. This note was due on May 15, 1989.

Between Bradford's January 12, 1989 letter to the bank and the February 12, 1989 restructuring of the note the debtor and the bank had apparently come to the recognition that the debtor needed not just a one-month deferral of a $7,500 principal payment but a 90–day deferral of any principal payments. The bank, however, apparently felt that the debt's final due date should be accelerated by a month. How they arrived at these terms is not disclosed in the evidence.

On February 24, 1989, the debtor made a 12–day late payment of interest of $484.38. On February 28, 1989, Bradford wrote to Madison in response to a request of uncertain date for financial information. Bradford enclosed various financial data and noted that since the sale of Writeoff, the debtor's monthly newsletter,

> Since [the sale of Writeoff] our business and marketing have changed more than we anticipated. We are putting our new marketing plan in place in 9 cities and expect cash flows close to our projection for March, April, May, and June.

> While our market changed and our marketing plan was being switched from sponsorships to direct sales, our cash flow disappeared. We expect to be back to a positive cash flow in April, 1989.

On March 12, 1989, the debtor made its final payment to Madison of $4,954.37 ($4,500 principal and $454.37 interest). No principal was then due under the terms of the note and this was the first timely payment of interest.

On April 4, 1989, the debtor ceased operations and then on April 23, 1989, the involuntary bankruptcy petition was filed against the debtor.

2. Application of § 547(c)(2) to Facts

Section 547(c)(2) provides that the trustee may not avoid under § 547(b) a transfer that was:

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee;

(C) made according to ordinary business terms.

Section 547(c)(2) was intended "to leave undisturbed normal financial relations, because [such an exception] does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 373–74 (1977), reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 6329. The burden of proof rests on the transferee. 11 U.S.C. 547(g).

### Section 547(c)(2)(A)

■ The first of the three requirements the defendants must establish is that the debt "was incurred in the ordinary course of the debtor's business and of the Bank's business." *Union Bank v. Wolas,* — U.S. at ——, 112 S.Ct. at 533 part IV of opinion. This requirement is not often litigated and is usually easily satisfied in the case of transactions with unrelated parties for general business purposes. *Compare In re Pioneer Technology, Inc.,* 107 B.R. 698 (9th Cir. BAP 1988) ("short term loan made by a debtor's shareholder in order to allow the debtor to maintain operations despite capitalization problems falls [outside] the ordinary course of business exception") *with In re Fulghum Const. Corp.,* 872 F.2d 739 (6th Cir.1989) (shareholders' recurring loans to debtor and to other entities it owned to meet immediate cash flow needs come within § 547(c)(2)(A)). The evidence established a long history of the debtor's making borrowings of this nature from Madison and the loans were not for an unusual purpose. The borrowings were within the ordinary course of the debtor's business. The court may further take judicial notice that Madison was engaged in making commercial loans and that the loans were thus not outside of its ordinary course of business.

The restructuring of the existing debt on February 12, 1989, arguably might be viewed as outside of the ordinary course of the debtor's business. However, the proper approach is to view the debt as simply a continuation of the pre-existing debt, with a revised deadline for payment of principal. *In re Magic Circle Energy Corp.,* 64 B.R. 269, 273 (Bankr.W.D.Okla.1986). As such,

the testing of the ordinariness of the February 12, 1989 revision of terms and payment thereunder is more appropriately addressed under § 547(c)(2)(B) and (C).

### Section 547(c)(2)(B)

The second requirement the defendants must prove is that the transfers were "made in the ordinary course of business ... of the debtor and the transferee." In arguing that § 547(c)(2)(B)'s requirement have not been shown, the trustee points to the lateness of the payments under the terms of the notes, the debtor's new insolvency in the one-year preference period, the debtor's increasing delay in paying trade creditors in the fall of 1988 and the early months of 1989, the adoption of a "squeaky wheel" rule of payment in the early months of 1989, and the guaranteed nature of the Madison loans in contrast to ordinary trade debt.

■ The courts look to the course of conduct between the debtor and the transferee in evaluating § 547(c)(2)(B). *Fulghum Constr.,* 872 F.2d at 743 ("focus of this court's inquiry must be directed to the particular parties under consideration and not to the practices which generally prevailed in the industry of the parties"); *WJM, Inc. v. Massachusetts Dept. of Pub. Welfare,* 840 F.2d 996, 1011 (1st Cir.1988) ("the cornerstone of this element of a preference defense is that the creditor needs to demonstrate some consistency with other business transactions between the debtor and the creditor") (quoting *In re Magic Circle Energy Corp.,* 64 B.R. at 273; *Lovett v. St. Johnsbury Trucking,* 931 F.2d 494, 497–98 (8th Cir.1991). Among the factors the courts have looked to are: whether the payments resulted "from 'unusual' debt collection or payment practices," *In re Craig Oil Co.,* 785 F.2d 1563, 1566 (11th Cir.1986); whether the transfer "is one designed to give the transferee an advantage over other creditors in bankruptcy ... [i.e.,] was related in any way to pre-bankruptcy planning," *In re Colonial Discount Corp.,* 807 F.2d 594, 600 (7th Cir.1986); and whether there was a change in the ability of the transferee to obtain a secured status

in the event of non-payment, *In re J.P. Fyfe, Inc.*, 891 F.2d 66, 71 (3d Cir.1989).

■ The payment on March 12, 1989, of $4,954.37 consisting of a gratuitous advance payment of $4,500 in principal and a $454.37 payment of interest was made after the debtor and Madison had entered into the February 2, 1989 restructured note which provided for payment of principal at maturity. The payment preceded the debtor's termination of operations by only 23 days and was in the midst of its critically worsening financial woes. This payment was not in the ordinary course of the debtor's business affairs.

■ The February 24, 1989 payment of interest of $484.38 was 12 days late and was pursuant to modified note terms. Payments had previously included principal and the new terms were in recognition of the debtor's deteriorated financial circumstances. No prior history of accepting late payments of interest only existed. Moreover, it had not been the ordinary course of business between Madison and the debtor to allow a deferral of payment of principal. Had there been no renegotiated note, there is no question that the payment would be unusual because it was made when a monthly principal payment was long overdue. By changing the terms of their contract in the midst of the debtor's financial difficulties and during the one-year preference period, the parties cannot make regular that which would otherwise be non-ordinary. *Compare In re Magic Circle Energy Corp.*, 64 B.R. 269 (terms were renegotiated long before preference period) *with In re Gull Air, Inc.*, 82 B.R. 1, 4 (Bankr.D.Mass.1988) (terms renegotiated within preference period). For all of these reasons, the court concludes that the February 24, 1989 payment was not in the ordinary course of business between the bank and the debtor.

■ The January 13, 1989 payment of $517.29 was one day late and consisted of interest only. However, no prior monthly installments were outstanding. This payment was made incident to the debtor's letter seeking renegotiated terms. The bank had allowed late payments of one day

in the past and the payment has no appearance of being designed to secure Madison a pre-bankruptcy advantage. Rather, it was a showing of good faith, a partial adherence to the parties' past course of conduct, not at Madison's urging, to obtain a one-month extension of payments and hence it meets § 547(c)(2)(B). *Colonial Discount*, 807 F.2d at 600 ("note was initially assigned a short due date and the partial repayment on the note was made shortly before it was due and in consideration of an extension of the due date, all normal business arrangements").

That the debtor was insolvent does not require a contrary conclusion. *Id.*

■ That the debtor was generally not paying other creditors anywhere near timely similarly requires no different conclusion. Albeit in the context of § 547(c)(2)(C), one court has stated that:

> ... one must consider that at the time of the payments in issue, only pressuring creditors were being paid while all other creditors received no payments at all. *See* 2 W. Norton, Norton Bank.L. and Prac. § 32.19 (1981) ("[A] debtor faced with insufficient assets to pay all currently due liabilities may 'ordinarily' elect to pay one creditor in favor of all others, but such payment should not be protected under § 547(c)(2)...."

*In re Century Brass Products, Inc.*, 121 B.R. 136, 139 (Bankr.D.Conn.1990). That rationale does not apply here. There is no evidence the payments arose from pressure by Madison or that they were principally motivated by a desire to avoid a call on the defendants' personal guarantees. The debtor still had hopes it would survive and a sound future relationship with its bank lender was an understandable goal. The existence of a guarantee of the debt by the debtor's president is a relevant consideration in determining whether a payment was made in bad faith and hence out of the ordinary course of business. *Craig Oil*, 785 F.2d at 1566. But in the circumstance of this case, where the debtor still projected it could attain positive cash flow and the debtor had a valuable long-term relation-

ship with the bank, I decline to find bad faith on the sole basis of the payment of interest on the bank's guaranteed debt more promptly than other debts. *Compare DeSimeone, Section 547(c)(2) of the Bankruptcy Code: The Ordinary Course of Exception Without the 45 Day Rule,* 20 Akron L.Rev. 95 (1986) (bad faith payment motive can be implicit: "just the fact that the creditor has a personal guarantee of the debtor's president or sole shareholder covering the debt could cause him to be paid over others").

▮▮▮▮▮ In declining to find non-ordinariness in these circumstances, Section 547(c)(2)(B) uses the same phrase "in the ordinary course of business or financial affairs of the debtor and the transferee" as does § 547(c)(2)(A). The phrase can be read, as in the case of § 547(c)(2)(A), as referring to the affairs of the debtor and the affairs of the transferee. While the phrase has been read as referring to the affairs *between* the debtor and the transferee, a relationship of obviously great importance in testing ordinariness, that narrower relationship is subsumed within the broader view of both the affairs of the debtor and the affairs of the transferee. If the transfer is out of the ordinary course of the business affairs between the parties, even viewed in a vacuum, it becomes unnecessary to view the transfer against the background of all of the debtor's affairs. I conclude that under § 547(c)(2)(B) the court must also take account of whether the payment is ordinary within the course of the debtor's course of business with all creditors. *See* 2 W. Norton, Norton Bank.L. and Prac. § 32–19 (1981). But some variance in length of payment of creditors ought not alone make a payment non-ordinary. Congress could have required a lack of variance if that was its intent. Rather, the case law makes it clear that when examining the debtor's entire course of business with all creditors, the focus must be whether the payment was so unusual in comparison to the treatment of other creditors as to evidence an attempt to give the creditor an advantage over other creditors. If there is variance and it results from a bad faith motive, it ought not be protected by § 547(c)(2).

Thus, the safe harbor of § 547(c)(2) might not apply had Bradford engaged in a deliberate effort to come closer to paying off the guaranteed debt, in advance of inevitable bankruptcy, by not making payments to trade creditors and using those funds to pay the guaranteed debt. *Cf. First Federal of Michigan v. Barrow,* 878 F.2d 912 (6th Cir.1989). That bad faith circumstance is not present here because the debtor was struggling to survive, not merely attempting to string out an inevitable bankruptcy. Because the debtor was sliding into bankruptcy, it might have benefitted trade creditors had the debtor terminated operations immediately, thereby lessening the amount of trade debt subsequently incurred. Section 547(a)(2) furthers that goal somewhat by not allowing § 547(c)(2) to apply to creditors who receive unusually late payments, thereby encouraging a creditor facing the prospect of a delayed payment to seek to force a bankruptcy more promptly. But in the case of payments that are not unusually late, § 547(c)(2) evinces a congressional intention to encourage ordinary course payment of debt as long as there is a chance that bankruptcy may be averted.

While a requirement in § 547(c)(2) of an equivalence of remaining current with other creditors might make sound policy, Congress has not enacted that as part of § 547(c)(2). Inevitably in the slide into bankruptcy insufficient cash will be available to pay all creditors. As long as a transferee is not being paid out of the ordinary course, for example, based on bad motives, and is being paid on ordinary business terms, Congress has not seen fit to penalize the creditor kept more current.

The reasoning applicable to the January 13, 1989 payment applies as well to the 4–day late payment of $7,690.32 on June 2, 1988, the 14–day late payment of $8,175 on October 12, 1988, the 9–day late payment of $8,155 on November 21, 1988, and the 8–day late payment of $8,050 on December 20, 1988. The court in *In re Xonics Imaging, Inc.,* 837 F.2d 763, 767 (7th Cir.1988), held that "the conduct of a debtor, after

becoming insolvent, in failing to make payments within the time required by his contract with the creditor is presumptively nonordinary." *See Craig Oil.*, 785 F.2d at 1567. *See also In re Gold Coast Seed Co.*, 24 B.R. 595, 597 (9th Cir.BAP 1982). However, the same court recognized that "the parties to a contract [may] adopt an extra-contractual practice that becomes the ordinary course of business between them." *Xonics*, 837 F.2d at 767. Here the parties had a practice of payments being made within 14 days. Thus, the four late payments in 1988 were within the ordinary course of the parties' businesses. *Lovett v. St. Johnsbury Trucking*, 931 F.2d at 498–499; *In re Yurika Foods Corp.*, 888 F.2d 42, 44 (6th Cir.1989). Accordingly, I hold that the three payments in the fall of 1988 satisfied § 547(c)(2)(B).

*Section 547(c)(2)(C)*

■ So far the defendants have shown that the 1988 payments and the first payment in 1989 satisfy the ordinariness requirements of § 547(c)(2)(A) and (B). The defendants have wholly failed, however, to establish that these payments were on "ordinary business terms" as required by § 547(c)(2)(C). The defendants put on no evidence that it is a generally accepted business term for lenders to agree to any delay in making monthly payments on loans to borrowers of the debtor's character. This is not a matter upon which I can take judicial notice. The defendants pointed to no source to which the court could turn to take judicial notice. The industry practice could well be to hold such borrowers to the strict terms of the contract and at a minimum charge interest for the delay in payment. The parties' prior practice does not fill the evidentiary void either: that practice is relevant for purposes of establishing ordinariness as between the parties under § 547(c)(2)(B) but it can not establish what were ordinary business terms in the banking industry for this type of borrower. *In re Hancock–Nelson Mercantile Co., Inc.*, 122 B.R. 1006, 1015 n. 14 (Bankr.D.Minn.1991). Although it is a harsh rule, the defendants had the obligation to present evidence that the debtor's

payment practice were on terms that were objectively reasonable in the industry. *First Federal of Michigan v. Barrow*, 878 F.2d at 918–919; *In re Classic Drywell, Inc.*, 127 B.R. 874, 878 (D.Kan.1991) (reversing bankruptcy court which speculated, without evidence as to objective standards of the drywall industry, that "I'm sure there is quite a number of times in this industry where the credit terms are extended by suppliers in this situation"); *In re Hancock–Nelson Mercantile Co., Inc.*, 122 B.R. at 1011–12, 1014–1015 (record lacked evidence of industry standards to which 3-day to 18-day late payments conformed); *In re Loretto Winery, Ltd.*, 107 B.R. 707, 709–10 (9th Cir.BAP 1989); *In re Steel Improvement Co.*, 79 B.R. 681, 684–85 (Bankr.E.D.Mich.1987) (no evidence from which court could determine "whether the manner and timing of these late payments were consistent with the manner and timing of other payments in the parties' industry"). Late payments are presumptively non-ordinary for purposes of § 547(c)(2)(B), *Xonics Imaging*, 837 F.2d at 767, and ought to be for purposes of § 547(c)(2)(C) as well. Delays of even only a week or less cannot be overlooked as inconsequential under § 547(c)(2)(B), *Craig Oil*, 785 F.2d at 1568 n. 10, and ought not be overlooked under § 547(c)(2)(C) either. Although *Lovett v. St. Johnsbury Trucking*, 931 F.2d at 499, suggests that the parties' prior practice can establish what "ordinary business terms" were, it does so without discussion of contrary precedent and only by way of gratuitous dictum because it also concluded that there was evidence that the debtor's late payments conformed to the general practice in the industry.

■ The "ordinary business term" rule assumes that there is some brake on the unrestrained ability of the parties unilaterally to adopt practices that are at variance with ordinary conduct in the general business community or the particular industries in which the debtor and creditor operate. This was a case, after all, in which the debtor was always operating at a loss, hardly the paradigm by which the debtor's conduct would be judged ordinary. It is

not too much to expect the creditor to put on proof of the objective standard that applies. Section 547(c)(2) may be designed to encourage continued dealings with the financially distressed debtor by not disturbing normal financial relations. But, if, as here, the payments are not demonstrated to have been on customary business terms applied by banks to borrowers of the debtor's character, the record is devoid of proof of a key ingredient of normalcy. Because the defendant bears the burden of proof, the payment terms must be viewed as nonordinary. Departing from ordinary terms is a signal to the lender that it may be engaging in a preference and may encourage it instead to put the incurably financially ill debtor into an involuntary case, thereby stanching the flow of losses at an earlier stage, to the benefit of creditors, both present and future.

### D. § 547(c)(4) Exception

The next exception invoked by the defendants is § 547(c)(4) which excepts a transfer:

> ... to the extent that after such transfer, such creditor gave new value to or for the benefit of the debtor—
>
> (A) not secured by an otherwise unavoidable security interest; and
>
> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

Bradford and Purcell lent the debtor $25,000 in September 1988 and $11,000 on February 15, 1989. They received no repayment on those loans. The court rejects the trustee's argument that Bradford's testimony must be rejected as self-serving. The trustee urges that he has no evidence of the loan actually being made but put on no witness to establish that the debtor's records do not reflect these infusions of cash.

■ The first Bradford and Purcell loan of $25,000 was preceded by only one repayment to Madison, the payment of $7,626.87 on June 6, 1988. That amount is not recoverable as a preference from Bradford and Purcell by reason of § 547(c)(4). The $17,373.13 balance of the $25,000, however, may not be applied under § 547(c)(4) to

negate future repayments to Madison because § 547(c)(4) only applies to new value received *after* the preferential transfer.

■ The court further rejects the defendants' assertion of a right of setoff of the $17,373.13 balance of the $25,000 loan against the preference claims under 11 U.S.C. § 553(a). The preference claim arose only on the filing of the petition and hence is not a claim of the debtor against the creditor "that arose before the commencement of the case" within the meaning of § 553(a). Moreover, § 547(c)(4) would be unnecessary if § 553 applied to allow setoff against preferences of all outstanding claims of the creditor benefitted by a transfer. Finally, 11 U.S.C. § 502(d), in disallowing any claim of a creditor who has not paid to the estate the amount of any avoided transfer, plainly contemplates that there will not be setoff of such claims against avoided transfers.

■ The next loan by defendants of $11,000 on February 15, 1989, was preceded by $24,897.21 of the remaining payments to Madison ($8,175 on October 26, 1988, $8,155 on November 21, 1988, $8,050 on December 20, 1988, and $517.29 on January 13, 1989). The $11,000 loan preceded the February 24, 1989 and March 12, 1989 payments to Madison of $484.38 and $4,954.37, respectively, and cannot be used to except those payments from § 547(b). The $11,000 loan could be applied under § 547(c)(4) to any of the $24,897.21 in payments to Madison which preceded it. *See In re Meredith Manor, Inc.*, 902 F.2d 257 (4th Cir.1990).

Thus, the trustee is entitled to recover only $13,897.21 of the transfers preceding the February 15, 1989 loan. The trustee is entitled to recover the $5,438.75 in payments arising after the February 15, 1989 loan. His total recovery under Count I is thus $19,335.96, with interest after the filing of the complaint.

### II

### Count II—Payment on American Express Card

Count II of the complaint dealt with payments to American Express on Bradford's charge card.

## A. *Issue of Release Under D.C. Law*

██ Bradford argues that under the common law of the District of Columbia he has been released by the release which the trustee has entered into with American Express. The court rejects that defense. The claims against Bradford and American Express are for preferences and an unauthorized post-petition transfer, statutory remedies under the Bankruptcy Code. Both parties have assumed that District of Columbia law controls the effect of the release upon those claims against Bradford. I reject that assumption: the effect of a release of a Federal statutory cause of action is a Federal question. *Dice v. Akron, Canton & Youngstown Railroad,* 342 U.S. 359, 361–62, 72 S.Ct. 312, 314, 96 L.Ed. 398 (1952); *Locafrance U.S. Corp. v. Intermodal Systems,* 558 F.2d 1113, 1115 (2d Cir.1977). Federal law rejects the common law rule. Moreover, no Federal policy would be served by following local law on this point. *Locafrance,* 558 F.2d at 1115. The common law rule Bradford invokes is archaic and has been soundly criticized. *See* 4 *Corbin on Contracts* § 931 (referring to "archaic and senseless strictures of the early common law"). The congressional intention of allowing trustees to achieve equality amongst creditors by way of 11 U.S.C. §§ 547 and 549 would not be well served by subjecting trustees to an archaic rule constituting a trap for the unwary.

## B. *Post–Petition Payment*

██ On May 12, 1989, after the filing of the petition, the debtor paid American Express $2,471.89 on account of a pre-petition bill to Bradford on his American Express bill representing charges for goods and services Bradford purchased on the debtor's behalf. Exhs. 33 and 39. The post-petition transfer was made without an order of the court and is avoidable under 11 U.S.C. § 549. The trustee has established an avoidable transfer of $2,471.80 under 11 U.S.C. § 549, and one for which Bradford is liable under 11 U.S.C. § 550(a)(1) as the transfer was made on Bradford's behalf. The effect of American Express's payment of $8,000 is addressed in part D, below.

## C. *Pre–Petition Payments*

During the year prior to the filing of the petition, at times when the debtor was insolvent, the debtor paid the following to American Express on account of Bradford's past due account:

| December 30, 1988 | $2,639.15 | Exh. 25 |
| February 28, 1989 | $ 903.50 | Exh. 41 |
| February 28, 1989 | $ 310.44 | Exhs. 25, 40 |
| March 27, 1989 | $4,822.51 | Exhs. 26, 42 |
| TOTAL | $8,675.60 | |

There is no dispute that the pre-petition transfers qualify as a preference under 11 U.S.C. § 547(b). They were made for the benefit of Bradford as a creditor of the debtor. § 547(b)(1). The payments were made on account of the debtor's debt pursuant to its obligation to reimburse Bradford, § 547(b)(2), while the debtor was insolvent, § 547(b)(3), and within one year of the date of filing of the petition, § 547(b)(4). Finally, they enabled Bradford to receive more than he would receive if the payments had not been made and Bradford had received payment under title 11. § 547(b)(5).

Bradford invokes § 547(c)(2) as an exception to § 547(b). This requires an examination of each transfer. Payments on behalf of Bradford were not within the regular billing cycle for the account, but that may not be dispositive.

(1) First Payment Excepted by § 547(c)(2)

██ The first payment in dispute, $2,639.15, was owed as part of the November billing and showed up as still unpaid on

78

the December billing and hence was delinquent under the terms that existed between Bradford and American Express. It was paid on December 30, 1988, three days after the billing closing date of December 27, 1988. However, Bradford was not penalized for this minor delay. Bradford has established that this payment is excepted by § 547(c)(2). The payment was in payment of the debtor's debt to Bradford incurred in the ordinary course of the financial affairs of Bradford and the debtor. § 547(c)(2)(A). The payment was made in the ordinary course of the business and financial affairs of the debtor and Bradford. § 547(c)(2)(B). Finally, the payment was made according to ordinary business terms as required by § 547(c)(2)(C): Bradford submitted the bill to the debtor and the debtor paid it in sufficient time for its employee, Bradford, not to be penalized on his charge card account. The pertinent inquiry is not, as the trustee urged, whether the payment was on ordinary business terms governing the relationship between American Express and Bradford. Rather, the critical focus is what were the ordinary business terms governing the relationship between the debtor and Bradford. While the payment, as between Bradford and American Express, may have been late by a few days as far as American Express was concerned, that is not controlling. As between Bradford and the debtor, the payment was timely and on ordinary business terms governing an employer's reimbursement to an employee of employee-incurred expenses. There is nothing extraordinary about a reimbursement that allows the employee to make payment on his charge card without penalty in the absence of evidence that the few days delay would have some kind of adverse effect on Bradford.

### (2) Second and Third Payments Not Excepted by § 547(c)(2)

■ The second and third payments of $903.50 and $310.44 on February 28, 1989, were for the $1,213.94 amount billed January 27, 1989. Of that, $903.50 had already been billed as part of the $3,542.65 December 27, 1988 bill against which only $2,639.15 was previously paid. On Febru-

ary 10, 1989, American Express sent Bradford a letter advising him that the $903.50 was past due as of February 9, 1989. The debtor received this letter on February 16, 1989. On February 25, 1989, American Express sent Bradford a bill with a 2.5% delinquency charge (the equivalent of 30% per annum) *on the full $1,213.94 then past due.* Bradford has failed to show that the payments on his behalf as an employee totalling $1,213.94 were made according to ordinary business terms as required by 11 U.S.C. § 547(c)(2)(C): an employer ordinarily does not delay payment on behalf of a employee to the point that high delinquency charges are incurred.

### (3) Fourth Payment Excepted by § 547(c)(2)

■ The fourth and last payment was $4,822.51 on March 27, 1989. This amount was owed as of February 25, 1989. The failure to pay this by the end of the next billing cycle, however, is not fatal. The payment was issued and presumably mailed March 27, 1989. No penalty was apparently incurred as a result of this payment. As in the case of the first payment of $2,639.15 (and for the reasons discussed above with respect to that payment), Bradford has carried his burden of proving that this payment of $4,822.51 is excepted by § 547(c)(2).

### D. *Effect of $8,000 Payment by American Express*

■ Because Bradford has shown that the payments of $2,639.15 and $4,822.51 (totalling $7,461.66) are excepted from § 547(b), the trustee has proven avoidable pre-petition transfers with respect to the American Express payments of only $3,685.83. He additionally established a $2,471.80 avoidable post-petition payment. Thus, he has established a total of avoidable transfers of $6,157.63. But American Express has already paid the trustee $8,000.00 in settlement of the claims which totalled $13,619.29. Obviously, the trustee could never recover more than $5619.29 from Bradford. But can the trustee recover even that amount now that he has

shown that only $6,157.63 of the claims were valid?

Neither party has addressed the question whether the trustee may nevertheless apply the $8,000.00 received from American Express first to those transfers the court has found were not avoidable. The court believes that the trustee must be deemed to have applied the $8,000 first only to those transfers for which liability actually existed. The trustee collected by settlement with American Express more than he could have if American Express had held out for trial. The trustee ought not be allowed to recover from Bradford another $5,619.29. That would be a $13,619.29 recovery when only $6,157.63 of avoidable payments in fact occurred. That would be an unjustified windfall. Accordingly, judgment will be entered in favor of Bradford dismissing the claims regarding American Express payments.

### III

#### Count III—Payment on Citibank Card

Count III of the complaint sought recovery with respect to $4,138.15 in allegedly preferential payments on Bradford's Citibank card. However, in his pre-trial statement the trustee advised that Citibank had paid the principal amount of the claim and that interest only remains due under this count. At trial the trustee presented no evidence concerning this count, apparently in light of a prior ruling that interest on preferences will generally be allowed only from the date of the complaint, thus presenting a de minimus amount of interest at stake.[2] This count will be dismissed with prejudice.

### IV

#### Count IV—Preferential Transfer of Equipment

██ Count IV seeks to recover $6,150 for a transfer of equipment. The debtor ceased operations on April 4, 1989. On or about April 18, 1989, Bradford caused the debtor to transfer to him $6,150.00 worth of equipment on account of severance and past due vacation pay owed by the debtor to Bradford. The complaint alleged that this was on account of severance pay. Bradford was owed severance pay roughly equal to the $6,150.00. The transfer was also for accumulated vacation pay, with Bradford in effect waiving his claim for the amount in excess of the value of the equipment. Bradford defends that no preference existed because the severance pay was not an antecedent debt, that the payment would be excepted under 11 U.S.C. § 547(c), and that the value is too high. I agree with Bradford's contention that the trustee has failed to show the existence of an antecedent debt. Thus, although I do not find his other defenses persuasive, I need not discuss them.

The payment was made while the debtor was insolvent, made within 90 days before the filing of the petition, and enabled Bradford to receive more in this case than he would have had the transfer not been made and had Bradford received payment of his claim under the distribution provisions of 11 U.S.C. § 726.[3]

Nevertheless, the transfer is not a preference because the trustee has not carried his burden of proving that the payment was on account of an antecedent debt. Although the debtor and Bradford's agreement concerning severance pay existed long before he was paid, no obligation to pay severance pay arose until he was severed. The debtor's severance pay policy was not based on length of service and hence the right to severance pay was not "earned" until Bradford was terminated. *See In re Jeannette Corp.*, 118 B.R. 327 (Bankr.W.D.Pa.1990). Thus, this cases

---

**2.** The complaint was filed April 30, 1991, and Citibank made payment by September 26, 1991.

**3.** Viewed as a whole, the $6,150 transfer satisfies 11 U.S.C. § 547(b)(5). There is no evidence that anyone other than Bradford held claims for unpaid wages when the case was filed. Under 11 U.S.C. § 507(a)(3) an allowed unsecured claim for severance pay earned within 90 days of the date of the cessation of the debtor's business is entitled to priority only to the extent of $2,000. I need not decide whether $2,000 of the transfer would not be avoidable or instead the transfer must be viewed as a whole.

does not present the issue whether the debt was antecedent because already earned.

Severance is a unilateral act and payment is not usually made until the employee actually is severed. But an employer may well pay severance pay in advance of the formal act of severing the employee, or the employer may pay severance pay simultaneously with the delivery of the notice of severance. Here the trustee only showed that the debtor ceased operations on April 4, 1989. There is no evidence that Bradford did not continue winding up the debtor's affairs even after it ceased operations. Indeed, although not admissible in evidence as part of the trial record, Bradford submitted an affidavit at the summary judgment stage reciting that he was still performing work for the debtor after the petition was filed. The trustee's evidence has failed to negate the possibility that Bradford's employment had not yet been severed when he received the $6,150 in equipment.

■ Nothing in the Bankruptcy Code precludes payment of severance pay in advance of the anticipated act of severance, even though severance is a unilateral act such that the employer has free will to incur the severance pay obligation without first paying the obligation. Although prepayment smacks of structuring the transaction to avoid the preference statute, the trustee does not argue that the prepayment is fraudulent under 11 U.S.C. § 548 or otherwise avoidable. I conclude that the trustee has failed to establish a preference. *Compare In re Intercontinental Publications, Inc.*, 131 B.R. 544, 549–50 (Bankr. D.Conn.1991) (severance payment made before payment due was nevertheless antecedent because made after obligation arose). The court thus will dismiss Count IV with prejudice.

## V

### Count VII—Fraudulent Transfer of $3,700 in "Advances"

■ In Count VII the trustee seeks to recover $3,700 in "advances" as a fraudulent conveyance under 11 U.S.C. § 548.

Bradford received payments labelled "advances" from the debtor totalling $3,700 during the 12 months prior to the filing of the petition (not $5,200.00 as alleged in the complaint). These "advances" were received by Bradford in addition to his regular yearly salary of $150,000. These "advances" are represented by Exhibits 28 through 32. Of these, Exhibits 29 through 32 evidence "advances" totalling $3,200 paid during 1988. A third "advance" of $500 was received in 1989.

Bradford travelled frequently on behalf of the debtor and had substantial expenses such as cab fares and tips to skycaps for carrying five cases of materials. Periodically, Bradford would be reimbursed and the checks issued as reimbursements were labelled as advances. They were labelled as such because at the end of each year, the expenses Bradford had incurred would be reconciled with the reimbursements he had received labelled "advances" and his expense account would be brought to a zero balance. Bradford used a checking account at Madison National Bank to cover his expenses on behalf of the debtor and he would use the "advances" to replenish that account from time to time. Bradford received the $3,200 in 1988 payments towards business expenses already incurred in 1988. The last check was issued on March 16, 1989 to Bradford in the amount of $500.00. There was never any reconciliation at year-end with respect to that payment because the involuntary petition intervened. But the amount and timing of the "advance" is consistent with the pattern of expenses he incurred and "advances" to cover them he had received in 1988. The court credits Bradford's testimony that all of these advances were for expenses already incurred. The debtor thus received equivalent value in exchange for the contested transfers and under 11 U.S.C. § 548 the plaintiff, as trustee, may not avoid the contested transfers.

The trustee has not sought in the alternative to amend the pleadings to claim that the payments are avoidable as preferences under 11 U.S.C. § 547(b), presumably because the payments would fit within an exception under 11 U.S.C. § 547(c) were

Bradford allowed to introduce avoidance on that issue. Accordingly, Count VII shall be dismissed with prejudice.

CONCLUSION

As to Count I, the trustee is entitled to recover from Bradford and Purcell $19,-335.96 of the payments the debtor made to Madison National Bank. Bradford is entitled to dismissal of Count II (concerning the payments to American Express) Count III (concerning the payments to Citibank) Count IV (concerning the transfer of equipment to Bradford) and Count VII (concerning payments of "advances" to Bradford).