In re The JULIEN COMPANY, Debtor.

Jack F. MARLOW, Trustee for The Julien Company, Plaintiff,

v.

FEDERAL COMPRESS & WAREHOUSE COMPANY, INC., Defendant.

Bankruptcy No. 90–20283–B(mjn).
Adv. No. 92–0044.

United States Bankruptcy Court,
W.D. Tennessee, W.D.

Aug. 19, 1993.

David J. Cocke, Borod & Kramer, Memphis, TN, for Jack F. Marlow, trustee.

Donald E. Bourland, John J. Heflin, III, Rickey, Bourland, Heflin & Alvarez, Memphis, TN, for Federal Compress & Warehouse Co., Inc.

**MEMORANDUM OPINION AND
ORDER ON SECTION
547(c)(2) DEFENSE**

WILLIAM H. BROWN, Bankruptcy Judge.

This adversary proceeding is before the Court after trial on the defense that allegedly preferential transfers are excepted from avoidance and recovery pursuant to the "ordinary course of business" exception found at 11 U.S.C. § 547(c)(2). Specifically, the trial focused on whether the transfers meet the requirements of § 547(c)(2)(B) and (C), as the parties agreed that the § 547(c)(2)(A) element was satisfied.

This adversary proceeding was initiated with the January 7, 1992, filing of a complaint to recover preferential transfers by the Chapter 11 Trustee, Jack F. Marlow ("Trustee"). According to this complaint, payments totalling $757,185.07 were made by The Julien Company ("debtor") to the defendant, Federal Compress & Warehouse Company, Inc. ("FCW"), within the ninety days preceding commencement of the debtor's bankruptcy case. Further, according to the complaint, these transfers were preferential.

FCW disputes the allegation that the transfers were preferential and further contends that even if they were, they are excepted from avoidance and recovery by Bankruptcy Code sections 547(c)(2) and (4).[1] Indeed, FCW previously filed a motion for summary judgment relying on these sections. The summary judgment motion was denied because of contradictory expert opinions offered in support of and opposition to the motion. *See* Order Denying Motion For Summary Judgment, entered November 30, 1992.

By agreement of the Court and the parties, the determination of whether each of the elements of § 547(b) are present in the transactions at issue has been trifurcated for purposes of trial from the questions of whether the transactions come within the exceptions of § 547(c)(2) or (4). The parties were anxious to try the exceptions first because they are not yet prepared to try complex factual issues of insolvency. Moreover, there are numerous adversary proceedings that may be consolidated for an insolvency trial, and this defendant wishes to avoid the expense of such a trial if it is successful on its defenses. Thus, the following findings of fact and conclusions of law made pursuant to F.R.B.P. 7052 are based upon the evidence presented at the trial on the § 547(c)(2) preference exception only. Trial of many of the § 547(c)(4) issues was reserved until resolution of the § 547(c)(2) issues. Because the Court will find that the § 547(c)(2) exception has been established in the proof by a preponderance of the evidence, it will be unnecessary for the Court to consider the § 547(c)(4) exception. Given the well settled state of the law in this circuit on the § 547(c)(2) issues, the results here are fact driven. This is a core proceeding under 28 U.S.C. § 157(b)(2)(F).

## BACKGROUND FACTS

The record reflects that the debtor's bankruptcy case was initiated with the filing of an involuntary Chapter 7 petition against the debtor on January 10, 1990. The petition was not formally disputed and by agreement, an order for relief was entered, the case was converted to a Chapter 11, and a trustee was appointed within ten days of the filing of the involuntary petition. Prior to the bankruptcy filing, the debtor was a cotton merchant engaged in the business of buying and selling cotton. As a buyer and seller of cotton, the debtor used cotton warehouses to store cotton between its purchases and sales.

The defendant, FCW, is one of the largest cotton warehousing operators in the United States. According to Mr. Charles Walker, a certified public accountant and FCW's chief financial officer for fifteen years, FCW owns and operates twenty-five warehouses in five states and, in 1989, FCW managed five additional warehouses. Mr. Walker further testified that FCW had done business with the debtor since 1986 and had, prior to that time, done business with Hohenberg Brothers Cotton Company of which the debtor's principal, Mr. Julien Hohenberg,[2] was a principal.

It is Mr. Walker's undisputed testimony that the following activities comprise the typical business relationship between FCW, as a cotton warehouser, and a cotton merchant or shipper, such as the debtor: Baled cotton is placed at a warehouse for storage. It is not purchased by the warehouse,

---

1. Unless otherwise noted, subsequent references to statutes or "sections" are references to provisions of Title 11 of the United States Code, i.e., the Bankruptcy Code.

2. Mr. Hohenberg is also a debtor in this district in a case that was converted recently from Chapter 11 to Chapter 7.

merely stored. Charges for storage and other services are set forth in a tariff, published annually by FCW. Tr.Ex. 5. A negotiable warehouse receipt is issued for each bale in storage. Tr.Ex. 4. Eventually, FCW will receive a transmittal letter from the shipper or merchant, usually the same party, together with warehouse receipts representing the cotton to be shipped and shipping instructions. Tr.Ex. 6. From this documentation a service order is prepared and transmitted, via computer, to the applicable warehouse. The cotton bales are then pulled from storage and prepared for shipment. Bills of lading are prepared when the trucks transporting the cotton arrive at the warehouse, and the cotton is loaded for transport to its destination. Information concerning the shipment and the date thereof is transmitted on the night of the shipment by computer to FCW's central billing department in Memphis. Within a day or two following the shipment, an invoice will be prepared by computer and mailed to the shipper for payment. Each shipper has its own account number with FCW. Computer generated invoices sent by FCW state that "[a]ll charges are due and payable seven days from date of invoice," while the aforementioned tariff provides for payment weekly. Tr.Ex. 7 and Tr.Ex. 5. However, Mr. Walker testified that enforcement of these seven day and weekly provisions has never been the general practice in the cotton industry. This testimony concerning industry practice is supported by the unanimous testimony of the additional experts questioned in this proceeding. According to Mr. Walker, the seven day language is printed on the invoice to encourage early payment and to support any later demand for payment against a customer who has not paid. If a merchant did not pay an invoice FCW ultimately would place that merchant on a cash basis. Given the absence of any cross examination or contradictory evidence to Mr. Walker's testimony, the Court is satisfied that it in fact describes the mechanics of the typical business relationship between a cotton merchant or shipper and FCW, as warehouser. The Court is further satisfied that this description reflects the mechanics of the business relationship between the debtor and FCW. Mr. Walker testified that there was no difference in the manner in which FCW conducted business with the debtor and with other merchants.

## DISCUSSION

The Bankruptcy Code provides authority for the bankruptcy case trustee to avoid and recover prepetition payments or transfers made by the debtor that prefer some creditors over others. This authority is provided to foster the Code's goal of ensuring equal treatment for similarly situated creditors. *See e.g., In re C–L Cartage Co., Inc.*, 899 F.2d 1490 (6th Cir.1990). In order to qualify as "preferential," transfers of an interest of the debtor's property must contain the following elements found at § 547(b):

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

However, even when these elements are present in a particular transaction, the transfer may be excepted from avoidance if any of the § 547(c) defenses are proven, including

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the *debtor* in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms; . . .

11 U.S.C. § 547(c)(2).

This exception "evinces a congressional intention to encourage ordinary course payments of debt as long as there is a chance that bankruptcy might be averted." *In re Tax Reduction Institute*, 148 B.R. 63, 74 (Bankr.D.Colo.1992). Indeed, the legislative history explains that § 547(c)(2) is intended "to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual actions by either the debtor or his creditors during the debtor's slide into bankruptcy." H.R.Rep. No. 595, 95th Cong. 1st Sess. 373 (1977), S.Rep. No. 989, 95th Cong.2d Sess. 88, U.S. Code Cong. & Admin. News 1988, 5787, 6329, 5874, *reprinted in* NORTON BANKR. CODE PAMPHLET 1992–1993 Ed., p. 529; *see also, e.g., In re Industrial Supply Corp.*, 127 B.R. 62, 64 (M.D.Fla. 1991), *aff'd*, 961 F.2d 1582 (11th Cir.1992).

The Trustee has the burden of proving the § 547(b) elements of a preference, while the defendant has the burden of proving each element of the § 547(c) defenses, by a preponderance of the evidence. 11 U.S.C. § 547(g); *In re Fred Hawes Organization, Inc.*, 957 F.2d 239, 243–244 (6th Cir.1992); *In re Washington Mfg. Co.*, 144 B.R. 376, 378 (Bankr.M.D.Tenn.1992). For purposes of this litigation, the parties have stipulated that except for § 547(b)(3) and (5), over which contest is reserved, the elements of a preference are present in these transfers. They have further stipulated that § 547(c)(2)(A) is satisfied here in that the debts for which the transfers were made were *incurred* by the debtor in the ordinary course of business between the parties and that the preference period began on October 12, 1989, and ended on January 10, 1990.

### 11 U.S.C. § 547(c)(2)(B)

The first issue presented is whether the payments were *made* in the ordinary course of business of the debtor and the transferee FCW. According to the Court of Appeals for the Sixth Circuit, this element or "prong" of the § 547(c)(2) exception is the "subjective prong" in that it measures what is ordinary between the parties. *In re Fred Hawes Organization, Inc.* ("*Hawes*"), 957 F.2d at 244. This "prong requires proof that the debt and its payment are ordinary in relation to other business dealings between *that* creditor and *that* debtor." *Id.* (emphasis in original). As such, courts considering the issue must engage in a "fact-specific analysis." *Id.* (citing, *In re Fulghum Construction Corp.*, 872 F.2d 739, 743 (6th Cir.1989) ("*Fulghum*")). Among the pertinent factors considered are the timing of the transfer, the amount of the transfer and manner in which it was paid, and the entire "circumstances under which the transfer was made." *Hawes*, 957 F.2d at 244 (citing *In re Yurika Foods Corp.*, 888 F.2d 42, 45 (6th Cir.1989) ("*Yurika*")). Typically, courts look for such factors as whether the transfers "resulted from unusual collection or payment practices, whether [they were] designed to give the transferee an advantage over other creditors in bankruptcy, and whether there was a change in the ability of the transferee to obtain a secured status in the event of non-payment." *In re Tax Reduction Institute*, 148 B.R. at 72 (citations omitted).

Moreover, although a late payment is presumptively non-ordinary, the presumption may be overcome and such a payment will be considered ordinary upon a showing that late payments were the normal course of business between the parties. *Yurika*, 888 F.2d at 44; *Hawes*, 957 F.2d at 244; *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 498 (8th Cir.1991) ("*Lovett*"). Basically "the cornerstone of this element of a preference defense is that the creditor needs to demonstrate *some consistency* with other business transactions between the debtor and the creditor." *In re Magic Circle Energy Corp.*, 64 B.R. 269, 273

(Bankr.W.D.Okla.1986) (quoted with approval in *Fulghum*, 872 F.2d at 743 (emphasis added)). *See also WJM, Inc. v. Mass.Dept. of Public Welfare*, 840 F.2d 996, 1011 (1st Cir.1988); *Lovett*, 931 F.2d at 497.

■ As noted above, FCW contends that the Trustee here is not entitled to avoid and recover any of the transfers at issue as preferences because each transfer complies with the requirements of § 547(c)(2) and is excepted from recovery. From the above discussion, it is clear that in order to demonstrate the applicability of § 547(c)(2)(B), FCW must prove the absence of any unusual collection efforts or protectionist demands directed at the debtor, and the absence of any other significant or material change in the way it treated the debtor during the preference period, along with the absence of any material change in the means, manner and amounts of payments made by the debtor to FCW. Pursuant to the Sixth Circuit's *Fulghum* case and its progeny, the standard is whether "some consistency" between the pre and post-preference time period transactions can be established by a preponderance of the evidence. 872 F.2d at 743 (citations omitted). Absolute consistency or perfection is not required by the statute, or by case authority, or by reality.

■ It should be noted, for purposes of this proceeding, that consideration of not merely the invoices and tariff but all the transactions which occurred for nine months before the onset of the preference period is sufficient to establish an "ordinary course of business" standard between these parties. *See, e.g., Lovett*, 931 F.2d at 497 ("The ordinary course of business, however, was the way the parties actually conducted their business dealings, not the conditions specified in the agreement that the parties in fact rarely followed."). The Court reaches this conclusion notwithstanding the Trustee's contention in his post-trial brief that the December, 1988, invoices and corresponding early January, 1989, payments; an April, 1989, payment made with a check that was allegedly temporarily lost and deposited late; and payments made in late June and early July, 1989, should not be considered for purposes of determining the ordinary timing of payments during the pre-preference period. The referenced payments are apparently those with the longest time between invoice and payment during the pre-preference period. Tr.Ex. 8.

According to one of the Trustee's witnesses, Joe Johnson, formerly in charge of reviewing warehouse invoices for the debtor until his employment was terminated in early October, 1989, the longer time periods between the December, 1988, invoices and the January, 1989, payments are attributable to a "backlog" of invoices in need of review when he was assigned that job, while the longer time periods between the invoices and the June and July, 1989, payments are attributable to his having been temporarily assigned to another project. Tr.Trans. pp. 211–213. Thus, the Trustee's argument is that the payments that were subject to these circumstances were not subject to "ordinary" circumstances and should not be considered as a measure of what was ordinary between the parties.

This argument is "most persuasive when least considered." *In re Cohoes Industrial Terminal, Inc.*, 90 B.R. 67, 69 (S.D.N.Y. 1988). The Trustee wants to exclude the outer extremes from what was ordinary before the preference time begins and to include the most extreme as evidence of nonordinariness during the preference period. As discussed above, ordinary for purposes of § 547(c)(2)(B) is what is ordinary for transacting business or financial affairs *between these parties*. To expect or attempt to impose an unchanging set of circumstances under which each payment must be made in order to be considered ordinary is beyond the reality of how businesses function and conflicts with the policy of this prong as interpreted by the Court of Appeals for the Sixth Circuit. *See Hawes*, 957 F.2d at 244; *Yurika*, 888 F.2d at 45. Consequently, the complete transactional history for the nine month pre-preference period has been considered for purposes of ascertaining the ordinary course of business between the debtor and this creditor, just as all of the transactions

within the preference period have been considered to determine whether each remain within the confines of the parties' ordinary course.

In support of its position that the preference period transfers at issue were made in the ordinary course of business between the parties, FCW has presented the testimony of Mr. Walker on behalf of FCW; the testimony of Donna Elzie, formerly the chief administrative officer and assistant corporate secretary for the debtor; and the testimony of Gayle Murchison, a former accountant for the debtor. Moreover, FCW contends that portions of the testimony given by the Trustee's witnesses support its position. In addition, FCW has submitted numerous graphs and charts as exhibits intended to demonstrate consistency between the debtor's nine month pre-preference and three month preference period payments to FCW.

In response, the Trustee contends that payments during the preference time period were late and thus not ordinary, and that the average time between the invoice dates and payment dates increased from 14.81 days for the nine months preceding October 12, 1989, to 17.81 days for the ninety days beginning October 12, 1989. According to the Trustee, payments were further not ordinary because they either were subject to a collection letter from FCW, were paid with a "manual" check, or were made for invoices that have no written indication that they were reviewed or "checked" by the debtor's traffic department before being paid, or, if not possessing one or more of these characteristics, were "tainted" by being part of a larger payment that included one or more of these characteristics. Post Trial Brief of … Trustee, p. 40. In addition, the Trustee asserts that none of the payments made during the preference period could be considered ordinary because of the debtor's financial condition at that time.

The "peculiarly factual nature" of the inquiry required by § 547(c)(2)(B) necessitates careful analysis of the evidence presented. *Fulghum*, 872 F.2d at 743 (citations omitted). From the foregoing discussion it is apparent that this careful analysis should include in this case an effort to determine whether there was a material change in the manner or timing of the payments made by the debtor to FCW, or the addition of any protectionist demands or unusual collection practices directed at the debtor by FCW. Whether a deviation was sufficiently significant to be considered as a shift from ordinary to nonordinary has been considered by the Court in its analysis of the facts presented by the proof.

FCW began its effort to meet its burden of establishing that its dealings with the debtor during the preference period were in the ordinary course of business between the parties by first presenting the testimony of Mr. Walker with supporting exhibits. Some of this proof went to both the § 547(c)(2)(B) and (C) prongs. According to Mr. Walker, FCW expects and receives the majority or bulk of payments from merchants for its warehouse charges ten to twenty-five days after the date of the invoice. This testimony is supported by, for example, Trial Exhibit 10, a computer printed list of 7,435 invoices paid by merchants other than the debtor in an average of 18.10 days. If a merchant does not pay an invoice, FCW would begin sending collection letters to that merchant. Mr. Walker testified that an aged accounts receivable listing is prepared each day by FCW. This document lists, by shipper, each shipper's outstanding invoices and the age of those invoices, e.g., fifteen days, thirty days, sixty days, and ninety days. *See, e.g.*, Tr.Ex. 23. Once a week, Ms. Durfee, an employee of FCW, reviews the list and determines those shippers to whom collection letters should be sent. According to Mr. Walker, recipients of these letters are typically shippers with invoices fifteen or more days old. The fifteen day age was chosen because FCW "wanted to move on the account before it would ever reach the 30–day period." Testimony of Mr. Walker, Tr.Trans., p. 101. Mr. Walker then reiterated that payment was expected between ten and twenty-five days. The criteria for selecting collection letter recipi-

ents is applied with equal objectivity to large and small shippers alike.[3]

In accordance with this procedure, many letters were sent during 1989 to numerous shippers including, e.g., Dunavant Enterprises, Inc., Allenberg Cotton Company and the USDA, along with the debtor. Collective Ex. 22.[4] During the latter half of 1989 FCW made a push to improve collections and increase cash flow and, in Mr. Walker's opinion, probably increased the number of letters sent out.

If the collection letter does not result in payment from a delinquent shipper, the shipper would be placed on a "cash basis." Mr. Walker described a "cash basis" as meaning that FCW would not ship cotton for a shipper until all warehouse charges for that cotton were paid. He further stated that it was his understanding that the warehouser has a warehouser's lien on cotton for its charges so long as the cotton is in the warehouser's possession. Tr.Trans., pp. 46–47. An additional method of dealing with delinquent shippers is requiring drafts on the shipper's bank account for the payment of warehouse charges. *Id.*

It is uncontroverted that FCW placed no "cash basis" or draft requirement upon the debtor prior to December 7, 1989. Tr. Trans., pp. 92–93. Indeed, Mr. Walker testified that no extraordinary payment demands or collection efforts were instituted by FCW against the debtor before that

time. Tr.Trans., p. 96. This testimony was corroborated by the testimonies of the debtor's former employees discussed below.

As mentioned above, numerous exhibits reflecting the pattern of payments from the debtor to FCW during the nine month prepetition period and comparing this pattern to the pattern of payments from other shippers to FCW were submitted in support of Mr. Walker's testimony. *See, e.g.,* Tr. Exs. 8, 11, 15 & 18. These exhibits demonstrate that the average number of days within which the debtor made payments to FCW increased from 14.81 days during the pre-preference period to 17.81 days during the pre-preference period. Tr.Exs. 8, 15. They further demonstrate that the majority of payments during the preference period were received between nine and twenty days after the invoice while the majority of payments during the preference period were received fourteen to twenty-three days after the invoice. Tr.Ex. 11. There were no payments within the preference period that exceeded the twenty-five day maximum expected by FCW. Tr.Ex. 20.

The Trustee contends that this time differential is not ordinary and that the collection letters sent to the debtor during the preference period constitute unusual collection efforts and remove any payments made pursuant thereto from the ordinary course of business between the parties. The Trustee did not cross examine Mr. Walker but takes issue with portions of his testimony regarding the timing of the debtor's payments and FCW's dispatch of col-

---

3. Mr. Walker defines "large" shippers as those with 200 or more invoices during the pertinent time period. Tr.Trans., pp. 65–66. It is not disputed that during this time period, the debtor had 327 invoices. *Id.,* Tr.Ex. 11.

4. The letters to the debtor, virtually identical to other letters in exhibit 22, state:

Our records indicate that your account with Federal Compress & Warehouse Company, Inc. is past due and the following invoice (a copy of which is attached) is unpaid:

| Invoice # | Invoice Date | Invoice Amount |
|-----------|--------------|----------------|
| 000000    | 00/00/00     | $000.00        |

Payments are due within 7 days from the date of invoice. If our invoice is in error, we would appreciate your advising Beverly Durfee at 901/524–4009. If you have just forwarded your payment to us, please disregard this notice and accept our thanks.

FEDERAL COMPRESS & WAREHOUSE COMPANY, INC.

lection letters in the Trustee's post trial brief. Obviously, this after-the-trial discussion of Mr. Walker's testimony absent responses by Mr. Walker is not entitled to the weight accorded his actual testimony in its original context. Nevertheless, the Court will address the issues raised by the Trustee's brief.

The Trustee first criticizes Mr. Walker's testimony and supporting documents as focusing on FCW's treatment of its customers generally rather than its treatment of the debtor specifically. Certainly, substantial information has been provided concerning FCW's treatment of its other customers; however, rather than serving as the basis for criticism, this information is useful for determining the ordinary manner in which FCW conducts its business. *See, e.g.,* Tr.Ex. 11. Moreover, sufficient information has been provided by Mr. Walker concerning FCW's treatment of the debtor for the Court to find that the treatment afforded the debtor is comparable to that afforded its other customers. This is a factor that may be weighed in assessing what is ordinary for and between these parties. After all, neither the debtor nor FCW did business alone or with each other in a vacuum separate from the larger cotton business world in which each party operated.

The Trustee next takes issue with Mr. Walker's testimony regarding the time within which the debtor made payments to FCW, i.e., nine to twenty-three days during the entire year, in light of the seven day payment requirement stated on the invoices and in collection letters sent to the debtor. Specifically, in response to Mr. Walker's statement that FCW expected to receive the bulk of its payments within ten to twenty-five days from the date of the invoice, the Trustee asserts, "[h]owever, there is no evidence in the record that this grace period was communicated to [the debtor]." Post Trial Brief of ... Trustee, p. 7. In making this assertion, the Trustee ignores the history of the invoicing and payment activity between FCW and the debtor. Although there may be no documented proof of written or oral notice of extension of the seven day payment period, the parties' payment history and the consensus of the experts who testified in this matter clearly establish that the seven day requirement was not adhered to by the debtor and FCW or virtually any other member of the industry. Indeed, from the evidence presented, under the authority of the *Yurika* case, the Court can and does find that payments made later than seven days from the date of or the receipt of the invoice are both ordinary between these parties and by industry standards within the meaning of § 547(c)(2). *Yurika,* 888 F.2d at 43.

The issue next raised is whether the increase in the average timing of payments from prior payment history, as opposed to the invoices' seven day payment term, and FCW's corresponding collection letters remove the transactions at issue from the ordinary course of business. Mr. Walker's unrefuted testimony and supporting documents have established that it was in fact ordinary for FCW to receive payments from its shipper-customers between ten and twenty-five days after invoice. *See, e.g.,* Tr.Exs. 10, 11, 13. Mr. Walker further testified, without dispute, that this was particularly true with regard to large or "big boy" shippers and that FCW considered the debtor to be a "big boy" in the industry. Moreover, FCW had placed no unusual collection or payment demands on the debtor prior to early December, 1989. Thus, even with the three to four day increase in the average number of days for payment, the payments were still received by FCW within what it considered to be an ordinary length of time.

The three to four day swing in the average number of days between invoice and payment is simply not a significant, material shift, particularly when the preference period payments remained within the ten to twenty-five days within which FCW expected payment. *See, e.g., Lovett,* 931 F.2d at 498. The Court has considered the slight change in average days for payment in the context of all of the facts and circumstances existing between the debtor and FCW. To expect absolute consistency in

actual or average payment dates, with the number of transactions between these parties, is unrealistic. Accordingly, it is reasonable to find that, at least from FCW's perspective, the payments were received within the ordinary course of business between these parties.

Further, according to Mr. Walker, collection letters were sent by FCW to all shippers with invoices over fifteen days old as a matter of course. The Trustee asserts that in addition to the increase in the average number of days between payments during the pre-preference and preference time periods, there was an increase in the number of collection letters sent to the debtor. This is logical; if there was an increase in the number of payments made by the debtor for fifteen day or older invoices, it follows that there would be an increase in the number of collection letters sent to the debtor in the ordinary course of business between these parties.

The Trustee suggests that the increases in collection letters sent to the debtor during the preference period evidences that FCW "targeted" the debtor for intensified collection efforts. Mr. Walker testified that a general push to increase collections and improve cash flow was initiated at FCW during the latter half of 1989. However, the Trustee has compared the number of collection letters sent to the debtor during the pre-preference and preference time periods and concludes that this comparison reflects a "drastic increase" in collection efforts directed at the debtor. This "drastic increase" is based in part on the Trustee's arbitrary classification of at least one of the pre-preference letters as "non-ordinary" and two of those letters as "mistakes." Post Trial Brief of ... Trustee, pp. 10–11.

Preference period collection letters were given no classifications of this or any other type by the Trustee. Consequently, it is not at all clear that the Trustee's comparison pits apples against apples in support of his argument of a "drastic increase" in collection efforts. The Court declines to accept this argument and prefers instead to rely upon the face value of the evidence presented, which supports a determination that the increase in collection letters logically correlates with the increase in invoices older than fifteen days. See Tr.Exs. 8 and 22. Moreover, there is no indication, even if the collection letters were increased, that FCW changed the way it extended credit to or did business with the debtor. Neither is there proof that the letters changed the way the debtor did business with and paid FCW. A reading of the letters, as quoted at footnote 4, will reveal that the collection letters were not coercive and that they did not contain "economic pressure to obtain payment." Lovett, 931 F.2d at 499. In summary, there is no proof that the collection letters were nonordinary nor that they altered the ordinary course of payment between these parties.

Finally, the Trustee attempts to show that FCW's treatment of the debtor was not ordinary when FCW instituted an increase of its receiving charge by a dollar a bale in September of 1989. According to the Trustee's witness, Joe Johnson, this increase was retroactive and had a negative effect on the debtor because the debtor "held a greater than average amount of old crop cotton" to which this increased charge applied. Tr.Trans. pp. 214–216. However, Mr. Johnson further testified that the increase was part of FCW's new tariff, published in September, 1989. Tr.Trans. p. 214. Thus, the charge increase was applicable to all of FCW's customers, not just to the debtor, and it constituted a change in charges not a change in the ordinary course of business. There is no proof that the tariff charge was related to a change in the debtor's credit standing or payment history with FCW. To accept the Trustee's theory would be to lock FCW into a permanent pricing structure, a result in itself that would not be an ordinary course of business.

Having thus concluded that the practices of invoicing, sending collection letters for invoices older than fifteen days and receiving payments between ten and twenty-five days after invoicing were in the ordinary course of business for FCW, the question

becomes what was in the ordinary course of business for the debtor. Most instructive on this issue is the collective testimony of Donna Elzie, Gayle Murchison, Michael Slater and Joe Johnson, all former employees of the debtor.

As noted above, Ms. Elzie was the debtor's chief administrative officer until the end of October, 1989. According to Ms. Elzie, invoices were paid on a first in—first out basis. There was no specific time deadline for the payment of invoices; rather, they were simply to be paid "timely," so that Ms. Elzie received no calls from unpaid vendors, usually within thirty to forty-five days from receipt of invoice. Tr. Trans. pp. 118–121. Ms. Elzie testified that the procedure begun in 1987 for handling thousands of accounts payable was as follows: The receptionist date stamped the invoices upon receipt and forwarded them to their respective departments for approval. Upon approval, they were returned to the accounts payable clerk for payment. There was no segregation of warehouse invoices from any other payable. Tr.Trans. pp. 116–120. This procedure remained unchanged until Ms. Elzie's departure on October 31, 1989. This was true even though the debtor began shipping cotton to the country of China in the late summer and early fall of 1989, which substantially increased its business volume from the prior year. Tr.Trans. pp. 122–124. According to Ms. Elzie there was no corresponding increase in personnel so that "their time didn't go quite as far ... [d]ue to volume.... [The employees did not always get] through with everything we had to do that day." Tr.Trans. p. 122.

No favorable treatment was given to FCW or any other warehouse in the payment of invoices during Ms. Elzie's tenure. Tr.Trans. pp. 124–125. Further, according to Ms. Elzie, the debtor was not denied credit, put on a cash basis, or required to pay charges by cashier's check or certified funds by any warehouse during her tenure. Tr.Trans. p. 125. Neither did the debtor "lay down on" or breach a contract while she was there. *Id.*

On cross examination, counsel for the Trustee directed Ms. Elzie's attention to several checks with which warehouse invoices were paid during the preference time period and on which the words "with full reservation of rights and privileges" had been stamped. Tr.Ex. 1; Tr.Trans. pp. 133–137. Trustee's counsel then questioned Ms. Elzie about whether this stamped language indicated that the debtor had changed its procedure of reviewing invoices before payment to attempt to reserve the right to review them after payment. Ms. Elzie testified that the stamp "would reserve our right" but she had no knowledge of whether the invoices were checked before payment after Joe Johnson's departure. Tr.Trans. pp. 134–135. According to Ms. Elzie,

I remember this stamp being drawn up on the orders of Mr. Hohenberg, and I remember at this same period of time that the stamp was used that every check had it on there. I don't recall any particular vendor or type of payable being clarified as the only ones to receive a stamp of this nature.

Tr.Trans. p. 136.

Ms. Elzie's testimony was followed by that of Ms. Gayle Murchison, a C.P.A., who had succeeded Ms. Elzie after her departure from the debtor in October, 1989. Ms. Murchison's testimony regarding the procedures employed for the payment of accounts payable was in complete accord with that of Ms. Elzie. She never received instructions to pay FCW out of the customary order. According to Ms. Murchison, the accounts payable were paid on a first in—first out basis daily up to the amount of money authorized by the debtor's financier, Bankers Trust Company. Ms. Murchison additionally testified that if an invoice did not have initials indicating that it had been reviewed she would "not let the check go out until it had been authorized." Tr. Trans. p. 158. This testimony overcomes any inference that the "reservation stamp" signified a change in authorization procedures. There is no proof that the stamp caused any material change in payment procedure. Nor is there any proof that the

stamp reserved any rights that the debtor would not otherwise have.

According to Ms. Murchison, no change in the procedure for paying invoices occurred at the debtor before December 7, 1989. Tr.Trans. pp. 152, 173–174. She further testified that both manual and computerized checks were routinely used by the debtor for making payments. The same procedure for authorizing payments was employed with respect to both types of checks. Tr.Trans. pp. 176–177. Only a certain amount of funding was available from Bankers Trust Company and the payables clerk went as far as money was available each day.

Mr. Johnson testified that from January, 1989, until his termination in the first or second week of October, 1989, his primary job responsibility was reviewing warehouse invoices for payment. Tr.Trans. p. 212. His testimony did not otherwise persuade the Court that there was any change in the ordinary course of business between FCW and the debtor.

Mr. Michael Slater, who became a consultant for Mr. Hohenberg in August of 1989 and then succeeded Donna Elzie and Scott Foster as a chief operations officer, testified that relations were good between Bankers Trust Company and the debtor until the end of November, 1989, and that Bankers Trust Company "fully funded" the debtor's operations on a daily basis until early December, 1989. Tr.Trans. pp. 231, 233.

Mr. Slater further testified that operations at the debtor were "chaotic" during September and October, 1989. Tr.Trans. 231. Ms. Elzie had provided similar testimony stating that, "[t]here was always the height of activity at The Julien Company. That was Julien's standard of business." Tr.Trans. p. 132. Neither witness indicated that these conditions affected the usual procedures and methods of paying accounts payable. To the contrary, both Ms. Elzie and Ms. Murchison testified that bills were paid in the normal manner during this

time period, and Mr. Slater testified that operations were "fully funded" until early December, 1989. Tr.Trans. p. 233. The preponderance of the evidence on this issue supports a finding that there was no material change in the manner in which the debtor conducted its business with FCW from the pre-preference to the preference period. In fact, the proof presented indicates that the increase in timing of the preference period payments may be attributed to the increase in the debtor's volume of business with no corresponding increase in personnel.

The Court has considered the testimony and exhibits introduced by the Trustee concerning the debtor's increase in liabilities during the preference period, but this proof did not persuade the Court that increasing liabilities necessarily dictated a finding that the debtor had ceased to make payments on its accounts in its ordinary course of business. If a debtor in a deteriorating financial condition is automatically excluded from making payments or transfers in the ordinary course of business, there is no need for the ordinary course exception. Congress obviously intended otherwise.

As a whole, the evidence demonstrates relative consistency in the business practices of these parties in their dealings with each other during both the pre-preference and preference periods. It is apparent that FCW was not concerned about receiving later payments from the debtor and continued to extend credit to the debtor on the same terms as it did for the pre-preference period. There is no persuasive proof that the debtor changed its payment procedure during the preference period or attempted to prefer FCW over other creditors.[5] From a preponderance of the evidence, it may be concluded that the dealings between the debtor and FCW during the preference period were representative of the normal dealings encouraged by the policy of § 547(c)(2)(B).

### 11 U.S.C. § 547(c)(2)(C)

■ This prong requires that this creditor received payment of its debt and that the payment is protected only

---

5. The Court's consideration of the Trustee's position included examination of charts and analy-

ses, not introduced into evidence but attached to the Trustee's post trial brief.

(2) to the extent that such transfer was—

(c) made according to ordinary business terms.

11 U.S.C. § 547(c)(2)(C).

The Court of Appeals for the Sixth Circuit has called this subsection of § 547(c)(2) the "objective prong" that "requires proof that the payment is ordinary in relation to the standards prevailing in the relevant industry." *Hawes*, 957 F.2d at 244. It has been demonstrated here, without controversy, that the debtor's practice of paying the subject invoices for warehouse charges by check, computerized or manual, is standard in the cotton industry. Thus, the issue becomes whether the payments otherwise comport with industry practices.

The Trustee contends that except for payments with an aggregate value of $43,-734.35, the payments here were not made according to ordinary business terms because they were untimely by industry standards or were tainted by association with untimely payments. It is the Trustee's position that the cotton industry's norm for the time between a warehouser's invoice and payment thereof is within fifteen days. The Trustee bases this opinion on his own observation of industry practices since his appointment as Trustee in this case and on the opinion of Mr. Frank Weathersby, an expert in some aspects of the cotton industry who was employed to advise and assist the Trustee. The Trustee's opinion on ordinary course payments was somewhat impeached by a prior interrogatory response (Tr.Ex. 3, p. 15), and Mr. Weathersby's opinion was not persuasive. *See, e.g.*, Tr. Ex. 16. In contrast, FCW asserts the opinion espoused by Mr. Walker that ten to twenty-five days between invoice and payment is ordinary in the industry. The experts who proffered this opinion, in addition to Mr. Walker, are Mr. Jerry L. Hill, vice president of Stahel America, a cotton merchant, and Mr. John Shoaf, the owner and operator of Milan Compress Company. In addition, Mr. Jack Robison, a consultant to Falconwood, a cotton merchant financier, and a former manager of the commodities division of First Tennessee Bank, testified that, from his observations, while most merchants paid warehouse invoices in seven to fourteen days, the warehousers did not seem to "worry about" whether they would be paid by a large shipper or "big boy" until thirty days after the invoice. Tr.Trans. pp. 186, 190–191.

As to collection practices in the industry, Mr. Shoaf's testimony illustrated that it was customary in the industry to start contacting merchants that did not pay invoices after some determined time frame. In his case he called merchants that did not pay invoices after some determined time frame. In his case he called merchants that did not pay invoices within twenty-one days. Such collection efforts as calls or letters appear to be routine and do not automatically render all payments subject to such calls or letters nonordinary. As Mr. Shoaf also testified, he considered payments to be within the ordinary course when received up to twenty-eight days after invoice.

Significantly, each of these experts, except Mr. Marlow but including Mr. Weathersby, testified that it is common in the industry for the larger shippers or "big boys" to pay later than smaller shippers. *See also* Tr.Exs. 12, 13, 14, 15, 16 & 17. Moreover, each of these experts, except Messrs. Marlow and Weathersby, opined that the debtor had been considered a "big boy" in the industry. Even though he conceded that because of their financial strength, "big boys" were generally allowed a longer time within which to pay their invoices, Mr. Weathersby was quite critical of the practice. Tr.Trans. pp. 265–271. When presented with evidence that the largest cotton merchants, for example, Dunavant Enterprises, Allenberg Cotton Co. and Weil Brothers, paid their FCW invoices during 1989 on an average of 17.22 days, 17.6 days and 21 days respectively, Mr. Weathersby opined that said merchants did not handle their accounts payable to warehouses in the ordinary course of business. Tr.Trans. pp. 268–271; Tr.Ex. 10. According to Mr. Weathersby, because their payments were later than fifteen days, they were "late." Tr.Trans. p. 270.

Mr. Weathersby further testified that in his forty plus years experience in the cotton industry, his cotton merchant business had received a phone call from a warehouse for late payment of an invoice only one time and that was because the warehouse had sent the invoice to Memphis, Texas, instead of Memphis, Tennessee, so that it did not reach Mr. Weathersby. Tr.Trans. pp. 243–244. Mr. Weathersby stated that payments later than fifteen days after receipt of the invoice are only excusable if there is a "discrepancy" or question regarding the charges. Tr.Trans. pp. 256–257.

When very effectively cross examined by counsel for FCW, Mr. Weathersby conceded that his opinion of a fifteen day rule was based on his payment experience; that is, he had no direct knowledge of when warehouses receive payment. Tr.Trans. pp. 260–261. According to Mr. Weathersby, his business simply paid promptly because that is what he thinks is right. He draws the line at fifteen days because he cannot compromise what he thinks is right. "Once you compromise you never quit." Tr.Trans. pp. 282–284. In contrast, FCW presented the testimonies of Messrs. Walker, Hill and Shoaf and numerous exhibits which support a finding that payment beyond fifteen days is "ordinary" in the industry. See, e.g., Tr.Ex. 20. For example, FCW's 7,435 invoices with all shippers other than the debtor for the period January 10, 1989, through January 9, 1990, demonstrated an average of 18.10 days between invoice date and receipt of payment. Tr. Ex. 9. For that time period, from all shippers doing business with FCW, fifty-four percent of payments exceeded fifteen days for payment. Tr.Ex. 16. This was consistent for large shippers. Tr.Ex. 17. In light of all of the evidence, it is clear that Mr. Weathersby is basing his opinion on his own personal attitude about prompt payment rather than on consideration of industry practices in general. While Mr. Weathersby's personal attitude may be commendable, it does not establish the industry's standard.

Mr. Weathersby defined "big boys" as having "financial strength." The Trustee argues that this testimony establishes that "special credit terms" were provided for the larger merchants whose creditworthiness justified such terms. Post Trial Brief of ... Trustee, p. 35. The implication of course is that the debtor was not sufficiently creditworthy to qualify as a "big boy" and thus, these later payments by the debtor were not ordinary pursuant to industry standards. In support of this suggestion that the debtor was not creditworthy during the pertinent time period the Trustee offers Mr. Weathersby's testimony that in his opinion it was "generally known on the street" that the debtor's financial strength was not good starting in August, 1989. Tr.Trans. pp. 246–247. In addition, Mr. Johnson testified that he noticed an increase in the number of warehouses that began to draft the debtor's account for payment in September, 1989. Tr.Trans. p. 213.

Mr. Weathersby's testimony on the creditworthiness of the debtor was not corroborated by any other industry expert, all of whom are involved in the cotton industry in this geographic area. In fact, Messrs. Hill, Shoaf and Robison specifically testified that they had had no knowledge that the debtor was in any financial difficulty during the preference period, and Messrs. Hill and Shoaf continued doing business with the debtor during that period. See, Dep. of Mr. Hill, pp. 18–19; Tr.Trans. pp. 204–205, 192. Moreover, the Trustee's own witness, Mike Slater, unequivocally testified that Bankers Trust Company "totally funded" the debtor's operations until the first part of December, 1989. Tr.Trans. p. 233. If the word of financial instability was on the street as Mr. Weathersby stated, why would others continue doing business with the debtor? Why would Bankers Trust Company continue to fund the debtor? Why would FCW continue to do business with the debtor in the same manner and on the same credit terms? On this issue, the preponderance of the evidence clearly supports a finding that, at least from all appearances to the industry, the debtor was a "big boy" in the industry prior to early

December, 1989. In addition, the evidence supports a finding that it was ordinary in the industry for the "big boys," including the debtor, to pay warehouse invoices later than the fifteen day limit espoused by Mr. Weathersby.

As discussed under § 547(c)(2)(B), there is substantial and persuasive proof that the debtor's payment history during the preference period was relatively consistent not only with the debtor's pre-preference period payments but also with the payment history of other shippers. *See, e.g.,* Tr.Exs. 15 & 18. Payments by the debtor to FCW also remained relatively consistent with the debtor's payment to all other mid-south warehouses. Tr.Ex. 19.

From a preponderance of the evidence, it may be concluded that the payments made by the debtor within the twenty-five day time period, characterized as customary by Messrs. Walker, Hill and Shoaf, were made according to ordinary business terms. There is also sufficient proof that the payments otherwise were within ordinary business terms of the cotton merchant industry.

## CONCLUSION

The Trustee falls into the myopia of focusing on particular aspects of the payments to FCW without viewing the payments in the total context of the course of business between FCW and the debtor or the course of business of the industry as a whole. It would be unusual to find total consistency in the number of transactions between these parties, but when viewed in context the changes highlighted by the Trustee are either not significant or are not so substantial as to render the transactions nonordinary. The ordinary course of business exception encourages continuation of normal financial relations between unsecured creditors and the debtor. To deny FCW the protection of the § 547(c)(2) exception from preference avoidance, under the evidence before the Court, would discourage FCW and similarly situated creditors from continuing normal credit transactions with debtors. Having found that the preponderance of the evidence supports ex-

tending the protection of this exception to FCW and FCW having carried its burden of proof on the ordinary course of business exception, the Trustee's preference avoidance is denied.

Based on the above findings and conclusions, it is hereby **ORDERED** that the defendant, Federal Compress and Warehouse Company, Inc., is entitled to a judgment of dismissal with prejudice of the complaint pursuant to 11 U.S.C. § 547(c)(2).

**SO ORDERED.**