**In re R.M. TAYLOR, INC., Debtor.**

**R.M. Taylor, Inc., Plaintiff,**

**v.**

**H.M. White, Inc., Defendant.**

**Bankruptcy No. 97–41320.**
**Adversary No. 99–4188.**

United States Bankruptcy Court,
W.D. Missouri.

Dec. 8, 2000.

---

John Lewis, Jr., Victoria M. Schroeder, Levi and Craig, P.C., Kansas City, MO, for plaintiff.

Mark T. Benedict, Husch & Eppenberger, Kansas City, MO, Jerry M. Ellis, Farmington Hills, MI, for defendant.

## MEMORANDUM OPINION

ARTHUR B. FEDERMAN, Chief Judge.

Debtor in possession R.M. Taylor, Inc. (RMT) filed this adversary proceeding to avoid alleged preferential transfers to defendant H.M. White, Inc. (White) totaling $334,170.00. On May 23, 2000, after RMT

filed the adversary, this Court converted the Chapter 11 case to Chapter 7. John L. Lewis, Jr., in his capacity as the Chapter 7 trustee (the Trustee), is now substituted as plaintiff. This is a core proceeding under 28 U.S.C. § 157(b)(2)(F) over which the Court has jurisdiction pursuant to 28 U.S.C. § 1334(b), 157(a), and 157(b)(1). The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure as made applicable to this proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure. For the reasons set forth below, I will find that the transfers in question here are not preferential.

## FACTUAL BACKGROUND

RMT was a general contractor engaged in the business of design, manufacture, and installation of conveyor systems for the automotive industry. To that end, RMT hired subcontractors to complete all or part of various construction projects. In turn, RMT was sometimes hired as a subcontractor on other construction projects for the automotive industry. In one such instance RMT entered into a contract with General Motors (GM) to construct the Frame De–Ice Oven System (Invoice Number 477585) at the East Assembly Plant in Pontiac, Michigan (the Pontiac East Project).[1] RMT hired as a subcontractor on this job defendant White, a Michigan industrial sheet metal contractor that designs, builds, and installs air handling equipment in automotive plants. White's subcontract agreement required RMT to pay it the sum of $477,868.00 for the work it was to perform. White began work on the Pontiac East Project in October of 1996, and completed the project on March 3, 1997. RMT made three progress payments to White; the first on December 18, 1996, in the amount of $67,680.00; the second on January 20, 1997, in the amount of $143,820.00; and the third on March 6, 1997, in the amount of $190,350.00. The latter two payments, totaling $334,170.00, are the subject of this preference action. Either immediately before or after RMT made the above payments, it obtained partial lien releases from White. RMT required such lien releases because GM only paid RMT upon proof of payment by RMT to its subcontractors.

On June 6, 1996, White, acting as the general contractor, had hired RMT as a subcontractor on a different job, referred to as the Lake Orion Project. In essence this subcontract agreement required RMT to make field installations during the July 1996, Thanksgiving 1996, Christmas 1996, and July 1997 shutdown periods at a GM factory. RMT completed the July 1996, Thanksgiving 1996, and Christmas 1996 installations. White made two payments to RMT, but one invoice, submitted by RMT to White on March 11, 1997, remained unpaid on April 11, 1997, when RMT filed its Chapter 11 bankruptcy petition. According to the testimony of Scott Simkins, RMT's controller at the time of the transfers at issue, and William White, White's president at the time of the transfers at issue, the balance due to RMT from White on that invoice, plus retainage, was $233,276.43, as of April 11, 1997.[2]

On January 20, 1997, RMT executed a check to White in the amount of $143,820.00 for work it performed on the Pontiac East Project prior to November 25, 1996.[3] In exchange, White signed a partial unconditional waiver of its construction lien, dated January 17, 1997, in the amount of $143,820.00.[4] On March 6, 1997, RMT executed a check to White in the amount of $190,350.00 for work it performed on the Pontiac East Project prior

---

1. Def. Ex. # 9.

2. *See also* Doc. # 17 (Brief in Support of Defendant's Motion for Summary Judgment), Ex. A (Plaintiff's Answers to Defendant's First Interrogatories) at pg. 11–13.

3. Pl.Ex. # 9 (H.M. White Invoice # 22146).

4. Def. Ex. # 11.

to December 31, 1996.[5] In exchange, White signed a partial lien release, dated March 17, 1997, waiving its construction lien in the amount of $190,350.00.[6] R.M. Taylor and Jill Richardson testified that RMT had to submit signed lien releases from the subcontractors to GM in order to receive further payment. According to RMT's bankruptcy schedules, GM still owed RMT $511,257.98 on the Frame De-Ice Oven System Project (Invoice Number 477585) on April 11, 1997.[7]

On April 9, 1999, RMT, as debtor in possession, filed this adversary proceeding. The Complaint alleges that RMT preferentially transferred the sum of $334,170.00 to White and seeks to avoid same. This Court held a trial on November 20 and 21, 2000. Both in its trial brief and at the hearing the Trustee argued that all of the elements of a preferential transfer are satisfied, and that none of the exceptions apply. White disagreed on several grounds. Since I find that White did not receive more than it would have received in a Chapter 7 liquidation, and that RMT and White intended the transfer to be a contemporaneous exchange for new value, I will deal substantively only with those arguments.

## DISCUSSION

### A. Preferential Transfer in General

Section 547(b) of the Bankruptcy Code (the Code) allows the bankruptcy trustee to avoid certain transfers that are deemed preferential.[8] As relevant here, a transfer of RMT's property made to White within 90 days of the bankruptcy petition on account of an antecedent debt that benefitted White more than other creditors similarly situated would be preferential:

(B) Except as provided in subsection (c) of this section, the trustee may avoid

any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition;

. . .

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.[9]

There is no dispute that RMT made two payments to White within 90 days of the bankruptcy filing on account of an antecedent debt, and that RMT was insolvent at the time of the payments. White does, however, dispute that RMT transferred property in which it held an interest, or that White received more than it would have received in a Chapter 7 liquidation. I begin with the liquidation analysis in section 547(b)(5).

### B. Sections 547(b)(5) and 553

Section 547(b)(5) posits the following questions. If RMT had not paid White the sum of $143,820.00 on January 20, 1997, and the sum of $190,350.00 on March 6, 1997, but had filed a Chapter 7 bankruptcy petition on April 11, 1997, would the estate have had more assets available

---

5. Def. Ex. # 5 (H.M. White Invoice # 22179).

6. Pl.Ex. # 30.

7. Pl.Ex. # 1, Schedule B, 15.1A (Accounts Receivable Listing), pg. 10.

8. 11 U.S.C. § 547(b).

9. Id.

to distribute to its creditors?[10] Or, from White's point of view, would it eventually have been paid those moneys anyway? The evidence demonstrates that, at the time White received the payments, it had a lien against GM's Pontiac East Plant for the amounts owed. Since White was paid, however, it released those liens, as it was required to do. For purposes of section 547(b)(5), it would appear at first blush that the payments made to White were no more than White would have received from GM by foreclosing on its lien. White, therefore, did not "receive" more than it would have received had RMT filed a Chapter 7 case without making the payment. And, such a result seems fair, because White, otherwise, would be required to return the payments to the estate without having its lien rights restored. However, section 547(b)(5) requires the Court to ask not what White would have received from any source had the payments not been made but, instead, whether RMT would have had more assets available to it in a Chapter 7 case if it had not made the payments.[11] I, therefore, must measure the impact on RMT's bankruptcy estate if it had filed a Chapter 7 case without having made these payments. The results of not making these payments would have been a concomitant decrease in the assets available, had RMT filed a Chapter 7 bankruptcy petition, for the following reasons.

First, it is undisputed that White was indebted to RMT in the amount of $233,267.43 for work RMT performed for White on the Lake Orion Project through December of 1996. And, it is undisputed that RMT was indebted to White in an amount in excess of that amount for work White performed for RMT on the Pontiac East Project through December of 1996.

■ Sections 506 and 553 of the Code recognize that to the extent a debtor and creditor hold pre-petition debts against each other, the obligation is secured and entitled to priority payment when one party files for bankruptcy relief.[12] Section 506 of the Code provides as follows:

(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim.[13]

Section 553 of the Code provides that the common law right of setoff is unaffected by the bankruptcy filing except to the extent the setoff right was acquired within 90 days of the filing:

(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor

---

**10.** 5 Collier on Bankruptcy ¶ 547.03[7] at 547–39 (Lawrence P. King, ed., 15th ed. rev. 2000).

**11.** *Swarts v. Fourth Nat'l Bank of St. Louis,* 117 F. 1, 3 (8th Cir.1902) (stating that the definition of a preference is not written from the perspective of the creditor, but rather, it is the act of the debtor that creates it). *See also Kaler v. Community First Nat'l Bank (In re Heitkamp),* 137 F.3d 1087, 1089 (8th Cir. 1998) (stating that a transaction is not preferential if, viewed as a whole, it does not diminish the debtor's estate); *Committee of Credi-*

*tors Holding Unsecured Claims v. Koch Oil Co. (In re Powerine Oil Co.),* 59 F.3d 969, 972 (9th Cir.1995); *Wedtech Corp. v. New York Nat'l Bank (In re Wedtech Corp.),* 187 B.R. 105, 107–108 (S.D.N.Y.1995); *White v. Bradford (In re Tax Reduction Institute),* 148 B.R. 63, 69 (Bankr.D.Dist.Col.1992).

**12.** *See Dewsnup v. Timm,* 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992).

**13.** 11 U.S.C. § 506(a).

that arose before the commencement of the case, except to the extent that—

(1) the claim of such creditor against the debtor is disallowed;

(2) such claim was transferred, by an entity other than the debtor, to such creditor—

(A) after the commencement of the case; or

(B)(i) after 90 days before the date of the filing of the petition; and

(ii) while the debtor was insolvent; or

(3) the debt owed to the debtor by such creditor was incurred by such creditor—

(A) after 90 days before the date of the filing of the petition; and

(B) while the debtor was insolvent; and

(C) for the purpose of obtaining a right of setoff against the debtor.[14]

For setoff purposes a debt arises when both parties have completed all of the tasks necessary for liability to occur.[15] In order to maintain a right of setoff, the creditor must prove three things: (1) that a debt exists from the creditor to the debtor that arose prepetition; (2) that the creditor has a claim against the debtor that arose prepetition; and (3) that the obligations are mutual.[16] In this context mutual means each party must own its

claim and the right to collect against the other.[17] As the Court in *Braniff Airways* noted, the fact that White did not actually set off its debt prepetition does not affect the analysis. If RMT had not paid White prepetition, White would have had a hypothetical right to offset its debt on the date RMT filed its petition.[18] If the debts are mutual and arise prepetition, then section 553 bestows secured status on the creditor to the extent of the amount of the setoff.[19] The Court in *Braniff Airways* stated that "the enactment of § 553 was an expression of the Congressional intent sanctioning the exercise of setoff as a permissible preference under certain circumstances."[20] Other Courts also recognize that setoff bestows preferential advantages to certain creditors over others.[21] In summary, the right of setoff, provided the right arises more that 90 days before the bankruptcy filing, confers secured creditor status on an otherwise unsecured creditor, and payments to a secured creditor are not preferential. Payments, therefore, made to that creditor within 90 days of the bankruptcy filing to the extent of the setoff amount are not preferential, and cannot be avoided by the trustee.[22] I, therefore, find that White had a valid setoff right as to a debt in the amount of $233,267.43, more that 90 days before RMT filed its bankruptcy petition, on the dates RMT made the transfers, and on the date RMT filed this bankruptcy petition. Thus, transfers from RMT to

---

**14.** 11 U.S.C. § 553(a).

**15.** *United States of America Through Agr. Stabilization and Conservation Service v. Gerth*, 991 F.2d 1428, 1433 (8th Cir.1993).

**16.** *Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1035 (5th Cir.1987).

**17.** *Id.* at 1036; Black's Law Dictionary 429 (Bryan A. Garner, ed.1996).

**18.** *Braniff Airways, Inc.* at 1040 n. 11.

**19.** *Braniff Airways, Inc.*, 814 F.2d at 1034.

**20.** *Id.* (citations omitted).

**21.** *See, e.g., New York County Nat'l Bank v. Massey*, 192 U.S. 138, 147, 24 S.Ct. 199, 201,

48 L.Ed. 380 (1904) (stating that payments are preferences, and subject to avoidance, if those payments diminish the estate, but setting off a mutual debt does not diminish the estate); *Rosof v. Roth*, 169 F.Supp. 707, 710 (S.D.N.Y.1957) (holding that when debtors set off a mutual debt, diminishment of the estate, the essential element of preference is missing); *Niagara Mohawk Power Corp. v. Utica Floor Maintenance, Inc. (In re Utica Floor Maintenance, Inc.)*, 41 B.R. 941, 943 (N.D.N.Y.1984) (stating that these advantages are accepted and approved because they are based upon long-recognized rights of mutual debtors).

**22.** *Id.* at 1034.

White in the amount of $233,267.43 could not be preferential because the estate would have been reduced by that amount had RMT filed a Chapter 7 petition without making the payments.

In any event, had RMT not made these payments, GM would have paid White, and reduced its obligation to RMT by the amount of the payments made. Michigan law provides that a subcontractor who supplies labor or materials to improve real property will automatically have a construction lien that arises as soon as the labor or materials are supplied.[23] The construction lien arises against any interest of the owner who contracted for the improvement to the property.[24] The construction lien will cease to exist, however, unless, within 90 days of the last labor or material furnished for the improvement, the subcontractor records a claim of lien in the office of the recorder of deeds where the property so improved is located.[25] It is undisputed that White completed its work as to the Pontiac East Project on March 3, 1997. Thus, had White not waived its lien rights in exchange for payment from RMT, those lien rights would have been valid on April 11, 1997, when RMT filed its Chapter 11 case. Had White exercised its lien rights against GM, GM would have been entitled to set off any amount paid to White against the funds it still owed to RMT.

RMT's schedules, which were offered into evidence by the Trustee, state that GM still owed RMT $511, 257.98 on the Frame De–Ice Oven Systems job on the date RMT filed its bankruptcy petition.[26] On March 6, 1997, the date of the second transfer to White in the amount of $190,350.00, GM was indebted to RMT for at least the sum of $938,873.65.[27] The Trustee offered no evidence to dispute the accuracy of these amounts. According to the evidence admitted, at all times after the transfers in question here, GM held funds belonging to RMT sufficient to fully secure it for any indemnity claim it would have against RMT if RMT failed to pay White, and White exercised its lien rights against GM. Thus, the bankruptcy estate was not diminished as a result of the transfers, and White did not receive more than it would have received in a Chapter 7 liquidation if the transfer had not been made. The Trustee, therefore, has not met his burden of proving that these transfers enabled White to receive more than it would have received had RMT filed a Chapter 7 case without having made the questioned payments.[28]

23. Mich. Comp. Laws Ann. § 570.1107(1) (West 2000).

24. *Id.*

25. *Id.* at § 570.1111.

26. Pl.Ex. # 1, Schedule B, 15.1A (Accounts Receivable Listing), pg. 10.

27. Def. Ex. # 9. (RMT Purchase Order TKS 96266, dated December 31, 1996) (Purchase Order from RMT to GM in the gross amount of $4,380,735.50, with 10 percent retainage of $438,073.56, payments to date in the amount of $2,041, 148.02, and balance due this invoice, $1,901,513.92). Purchase Order TKS 96266 resulted in a payment on February 10, 1997, from GM to RMT in the amount of $1,400,713.83, leaving a balance as of that date in the amount of $938,873.65.

28. *Kaler v. Community First Nat'l Bank (In re Heitkamp),* 137 F.3d 1087, 1089 (8th Cir. 1998) (holding that the trustee has the burden of proving the elements of a preferential transfer); *Trautwein v. Mandel,* 127 F.2d 567, 569 (8th Cir.1942) (holding that the trustee has the burden of pleading and proving the necessary elements of a voidable preference); *Haas v. Sachs,* 68 F.2d 623, 625 (8th Cir. 1933) (holding that the burden of proving the existence of the essential elements of a preferential transfer rests upon the trustee seeking to avoid the transfer); *Stingley v. AlliedSignal, Inc. (In re Libby Internat'l, Inc.),* 247 B.R. 463, 466 (8th Cir. BAP 2000) (holding that the trustee bears the burden of proving the elements of avoidability under section 547(b)); *Brown v. Callaway Bank (In re Meritt),* 7 B.R. 876, 879 (Bankr.W.D.Mo.1980) (holding that the law places upon the trustee the unmistakable burden of proving by a fair preponderance of the evidence the five essential elements of section 547(b)).

## C. *Section 547(c)(1)*

■ Even if all of the elements of a preferential transfer are established, there are some exceptions to the trustee's power to avoid such a transfer.[29] One such exception prohibits the trustee from avoiding a transfer if the debtor received new value in exchange for the transfer:

(c) The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange.[30]

Courts have held that under certain conditions the release of a lien, or the waiver of a lien right, is new value.[31] In *In re Hatfield Electric Co.* the Court stated that new value should be defined in the ordinary sense, which means value that prevents diminution of the estate.[32] The Court further opined that a tripartite relationship may satisfy this new value requirement to the extent the third party is fully secured.[33] The Court in *Hatfield* denied the transferee's motion for summary judgment, however, absent factual information regarding the amount of the retainage.[34]

In *In re Dick Henley, Inc.*, the Court stated that the release of a claim of a third party against the debtor could be new value to the debtor if the third party held retainage sufficient to secure the claim.[35] The Court reasoned that such a payment to the subcontractor in effect released funds for payment to the debtor. In this case, the transfer to White did not diminish RMT's estate because the transfer released other funds for payment to RMT that RMT would, otherwise, not receive.

Thus, I find that the payments to White are not preferential transfers because White did not receive more than it would have received in a hypothetical Chapter 7 liquidation if the transfers had not been made. Alternatively, I find that RMT received new value for the transfer when White released its lien rights, thereby releasing funds being retained by GM for payment to RMT in a like amount.

As to White's other arguments, based upon my findings above, I need not reach those issues.

An Order in accordance with this Memorandum Opinion will be entered this date.

29. *See* 11 U.S.C. § 547(c).

30. 11 U.S.C. § 547(c)(1).

31. *See, e.g., Simon v. Engineered Protection Systems, Inc. (In re Hatfield Electric Co.)*, 91 B.R. 782, 786 (Bankr.N.D.Ohio 1988) (stating that "to the extent the owner could withhold funds or payments due the debtor, which would have permitted satisfaction of EPS's lien claim, the estate was not depleted"); *Lang v. Heieck Supply (In re Anderson Plumbing Co.)*, 71 B.R. 19, 20 (Bankr.E.D.Cal.1986) (holding that the release of a lien is a contemporaneous exchange because the owner would otherwise have held indemnification rights against the contractor that would have diminished the estate in the same amount);

*Cooley v. General Elevator Corp. (In re Advanced Contractors)*, 44 B.R. 239, 241 (Bankr.M.D.Fla.1984)(holding that in the case where the debtor obtained a performance bond as required by the owner, the abandonment of a direct cause of action against the owner constitutes new value to the debtor); *Larose v. Crosby & Son Towing (In re Dick Henley, Inc.)*, 38 B.R. 210, (Bankr.M.D.La. 1984).

32. 91 B.R. at 785.

33. *Id.*

34. *Id.* at 786.

35. *In re Dick Henley, Inc.*, 38 B.R. at 214.